## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| **MICHAEL RADLE,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No.: 4:21-cv-1039 |
| vs. | ) |
| | ) |
| **UNUM LIFE INSURANCE COMPANY** | ) |
| **OF AMERICA,** | ) |
| | ) |
| | ) |
| Serve: | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

**COMES NOW** Plaintiff Michael Radle by and through undersigned counsel, pursuant to the Employee Retirement Income Security Act of 1974, as amended 29 U.S.C. §1001 *et. seq.*, and for his cause of action against defendant Unum Insurance Company of America, respectfully states the following:

1. Plaintiff, Michael Radle (hereinafter "Mr. Radle") brings this action against Defendant Unum Insurance Company of America (hereinafter "Unum") for damages caused by the Defendant's breach of statutory, contractual, and fiduciary obligations and violations of the Employee Retirement Income Security Act of 1974, as amended 29 U.S.C. § 1001 *et. seq.* ("ERISA").

2. This is an action brought pursuant to 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331. Under 29 U.S.C. §1132(f), the Court has jurisdiction without respect to the amount in controversy or the citizenship of the parties.

3. Venue is proper in this District pursuant to 29 U.S.C. §1132(e)(2), in that the subject employee welfare benefit plan and employee insurance program are administered in this District, the breaches of duty herein alleged occurred in this District, and Defendants reside or are found in this district.

## PARTIES

4. Mr. Radle is an individual residing in St. Louis County, in the Eastern District of Missouri. Mr. Radle is a vested participant in a Group Insurance Policy for certain employees of United Skin Specialist, LLC, which provides an employee benefit plan within the meaning of 29 U.S.C. §1002.

5. Mr. Radle has standing to bring this action as a beneficiary under 29 U.S.C. §1132(a).

6. Defendant Unum provides coverage for certain employees of United Skin Specialist, LLC under an employee welfare benefit plan (hereinafter "Plan") within the meaning of 29 U.S.C. §1002(1). Specifically, Unum provides Long Term Disability benefits (hereinafter "LTD") for United Skin Specialist, LLC employees.

7. Unum is an insurance company incorporated in Maine and doing business in Missouri under a license to do business as a Foreign Insurance Company.

8. Unum administers and pays benefits under the terms of the LTD Plan and is a fiduciary within the meaning of 29 U.S.C. §§1002(21) and 1102.

9. United Skin Specialist, LLC serves as the Plan Administrator and sponsor under the meaning of 29 U.S.C. §1002(16).

## Factual Allegations

10. On May 4, 2016, Mr. Radle, while running, tripped and hit his head on the concrete sidewalk.

11. While Mr. Radle admits he lost consciousness, he initially chose not to go to the hospital.

12. Four days later, on May 8, 2016, Mr. Radle began to experience an increase in symptoms related to his fall.

13. He experienced dizziness, difficulty focusing, headaches, a "buzzed" or drunk feeling, and developed sensitivity to noise and light. His vision became blurred, and he began to experience slanted vision.

14. For the safety of himself and others, May 8, 2016, was the last time Mr. Radle drove a vehicle.

15. On May 9, 2016, while at work, Mr. Radle began experiencing the same symptoms from the previous day in addition to slurred speech, stuttering, and a staggering gait. Due to these symptoms, he allowed his co-worker, Alexis Webb, to drive him to the St. Luke's Emergency Department.

16. At St. Luke's ER, Mr. Radle was diagnosed with a post-concussive syndrome.

17. Mr. Radle's last day of work was on August 15, 2017.

18. On August 15, 2017, Mr. Radle was admitted into Mercy Hospital after another symptomatic episode. There hospitalist Ryan Kroeger, and neurologist Dr. Logan, diagnosed Mr. Radle with conversion disorder.

19. Conversion disorder has been defined as a mental condition in which a patient shows psychological stress in physical ways. The disorder is most often seen in women and people who have had a previous psychiatric diagnosis.

20. Mr. Radle does not have a previous psychiatric history outside of two or three counseling sessions.

21. On August 21, 2017, Mr. Radle was sent by his primary care physician to St. Luke's hospital for further evaluation and a second opinion.

22. Again, Mr. Radle was diagnosed with a conversion disorder.

23. However, Mr. Radle was not prescribed any psychiatric medication because the psychiatrist felt he did not exhibit any psychiatric or behavioral disorders.

24. Mr. Radle began receiving Long Term Disability benefits effective November 14, 2017, due to cognitive symptoms and relating impairment resulting from a conversion disorder.

25. On May 12, 2020, Unum sent a denial letter discontinuing the payment of Mr. Radle's LTD benefits, stating that he had exhausted the 24 months of benefits payable for mental illnesses under the Plan.

26. On November 10, 2020, Unum received Mr. Radle's timely appeal of it's adverse determination of Mr. Radle's LTD benefits.

27. Mr. Radle submitted medical records dating from his fall in 2016 to present from twelve different physicians and four hospitals. All of which outlined the treatment and care Mr. Radle received and was receiving for his persistent and increasingly debilitating symptoms.

28. Throughout his medical treatment, the medical records reflected that Mr. Radle's symptoms progressed in severity.

29. His original diagnosis of a conversion disorder has been called into question by treating physicians.

30. Mr. Radle completed physical therapy, occupational therapy, and speech therapy to alleviate his symptoms with little to no results.

31. To date, Mr. Radle is still experiencing an irregular gait and has difficulty keeping his balance when ambulating, so he must rely on a walking cane.

32. Furthermore, he has to "focus" on his walking, even if these walks are only of a short duration. He has continued to have dizziness that he describes as a buzzed or drunk feeling and speech problems that include stuttering, slurring, and word-finding difficulties. He experiences various physical ticks and headaches that become worse in environments with bright lights, loud sounds, or situations in which he needs to concentrate.

33. Additionally, he reports intermittent left-sided numbness and that it takes him longer to process conversations because his memory of auditory material is low.

34. Finally, Mr. Radle has described that he has developed a "short-fuse" since the accident and quickly gets irritated or frustrated. He states that anything he does taxes his body, which has led to constant fatigue.

35. Mr. Radle's negatively progressing symptoms have prompted his current medical providers Dr. Catherine Radakovic, Dr. Mark Scheperle, and Dr. Joseph Yazdi, to re-diagnose his condition from a conversion disorder to a delayed post-concussive syndrome.

36. In all, Mr. Radle's current treating physicians opine that there is a physical cause to Mr. Radle's disability, instead of a behavioral issue.

37. Dr. Yazdi specifically highlights an EEG positive for left temporal slowing that would suggest a brain injury and visual testing done by Dr. Catherine Radakovic that supported Mr. Radle being diagnosed with a visual disability. (*See* Admin. R. at 677, 1232.)

38. As pointed out by Dr. Timothy Leonberger, diagnostic tests of Mr. Radle's brain show a cyst located near Mr. Radle's cerebellum, which is the part of the brain that is responsible for coordinating voluntary movement, balance, coordination, and posture. (*See* Admin. R. at 382.)

39. Despite Mr. Radle's treating physicians determining that conversion disorder is an improper diagnosis, Unum reviewing physicians have disregarded these reports.

40. Unum reviewers instead continue to conclude that Mr. Radle's fall in 2016 has led to a series of "exaggerated" ailments that, by definition, are all in his head.

41. They further conclude that these conditions cannot preclude him from his ability to return to his regular occupation demands.

42. However, based on Mr. Radle's medical records, the 2016 fall most likely aggravated these physiological defects and caused damage to Mr. Radle's brain, which in turn, is now manifesting the debilitating physical symptoms he suffers from.

### Independent Medical Exam

43. Mr. Radle submits for Unum's review an Independent Medical Examination (IME) performed by Dr. Joseph Yazdi, a board-certified neurosurgeon.

44. After examining Mr. Radle and reviewing the medical records, Dr. Yazdi concluded that Mr. Radle's evaluating doctors should have never found him exhibiting any psychiatric problems that could result in a conversion disorder.

45. He believes that the 2016 fall was the dominant factor causing Mr. Radle's head injury.

46. Dr. Yazdi concluded that Mr. Radle is experiencing a post-concussion syndrome, and it is of his opinion that Mr. Radle's deficits are permanent.

47. This report also concluded that Mr. Radle has reached maximum medical improvement (MMI).

48. Therefore, based on the totality of the medical records, Dr. Yazdi found Mr. Radle to be permanently and totally disabled.

49. The Neurosurgery IME confirmed the physical origin of Mr. Radle's Post-Concussion Syndrome.

50. In their denial letter, Unum argues that Dr. Yazdi's IME should be disregarded because, in part, Dr. Yazdi has treated Mr. Radle in the past, creating a conflict of interest.

51. As part of their regular practice, Unum hires for employment medical reviewers associated with the corporation to review a Plan's participant's medical files, creating a conflict of interest.

### Independent Neuropsychological Evaluation

52. On June 6th, 11th, and 19th of 2020, Dr. Timothy Leonberger performed an Independent Neuropsychological Evaluation of Mr. Radle.

53. The exam was proctored over a three day period because physically, Mr. Radle could not handle anything more extensive.

54. In Dr. Leonberger's evaluation, he ruled out exaggeration and malingering for secondary gain through a series of validity measures, including the Rey 15-Item Test, the TOMM, and the validity indicators on the MMPI-2.

55. Testing revealed Mr. Radle had an average range of intellectual ability, consistently average verbal and language abilities, an average visual memory, and a high average score on executive and cognitive functioning.

56. Physically, testing revealed that Mr. Radle performed at an:

   a. extremely low and borderline range for psychomotor speed and information measures;

   b. borderline range in testing areas that required concentration, visual scanning, and cognitive flexibility;

   c. extremely low to borderline range across several motor speed, coordination, and strength measures; and

      d. extremely low range on measures of fine motor speed.

57. Dr. Leonberger concluded that the symptoms produced by Mr. Radle were not psychologically based and did not meet the criteria for a conversion disorder.

58. As a result, Dr. Leonberger diagnosed Mr. Radle with an unspecified neurocognitive disorder (post-concussive syndrome), unspecified Tic Disorder (focal and motor), and unspecified depressive disorder.

59. Therefore, based on a reasonable degree of neuropsychological certainty, Dr. Leonberger's opinion of Mr. Radle is that he is disabled and cannot perform all the material duties of any occupation for which he is reasonably suited by virtue of his training, education, or experience.

60. Unum disregards Dr. Leonberger's opinion because the results are inconsistent with neurological testing performed in December of 2017 by Unum's neuropsychologists.

61. The June 2020 testing reflects improvements in memory function while showing a decline in psychomotor speed and fine motor function.

62. Reviewers concluded the above inconsistencies were unexplainable.

63. Despite this conclusion, Unum reviewers accepted inconsistencies about Mr. Radle's current level of personality functioning.

64. Specifically, Unum reviewers accepted the June 2020 testing results that showed Mr. Radle had an increase in mental health concerns compared to the 2017 testing.

65. By denying any increase in neurological issues but accepting the increase in mental health concerns, Unum's consulting neuropsychologists concluded that Mr. Radle's medically documented increase in stuttering, motor tics, and other such symptoms were psychogenic rather than neurological.

**Independent Vocational Assessment**

66. On October 16, 2020, Mr. Radle underwent an independent vocational assessment through Delores Gonzalez, a certified vocational rehabilitation professional.

67. Based on the national economy, Ms. Gonzalez determined that Mr. Radle's occupation best coincided with a Hospital Administrator, which she described as sedentary level work based on the Dictionary of Occupational Titles (DOT).

68. As a result of Ms. Gonzalez's review, it was deemed that Mr. Radle did not have transferable skills due to his significantly reduced residual functional capacity.

69. From a vocational perspective, Ms. Gonzalez stated that it was not reasonable to expect an employer to hire an individual with Mr. Radle's physical disabilities and conditions over a younger worker who would not have to be accommodated.

70. She concluded that the physical symptoms Mr. Radle exhibited in and out of the interview would significantly hinder him in the job market, especially in a clerical or sedentary-type work environment.

71. Additionally, Ms. Gonzalez observed that Mr. Radle experienced significantly impaired attention and concentration that all jobs, including unskilled labor, would require.

72. Overall, she opined that Mr. Radle's ongoing symptoms and the totality of the circumstances would make securing and maintaining work in the open labor market difficult, "if not impossible."

73. Therefore, Mr. Radle could not be a candidate for vocational rehabilitation, as he is not capable of any competitive work due to the May 2016 incident.

74. Despite being certified in vocational rehabilitation and counseling, Unum reviewer would not consider Ms. Gonzalez's observations because she was a non-medical expert.

75. Unum stated that in their review, Ms. Gonzalez's vocational opinion had been fully considered but did not clarify how.

76. Unum Benefit's center deemed Mr. Radle's occupation to be most consistent with a Practice Manager.

77. While the classifying occupation was different from Ms. Gonzalez's, they agreed there was no physical difference in demand between the two classifications.

78. Disregarding Ms. Gonzalez's report, Unum ultimately decided that the physical and non-exertional demands of Mr. Radle's regular occupation, as it was normally performed in the national economy, remained unchanged, and Mr. Radle was able to perform sedentary work.

79. Mr. Radle has submitted objective medical evidence to Unum that his multiple health conditions' effects and symptoms result in restrictions and limitations that prevent him from performing the material duties of any occupation.

80. At all relevant times, Mr. Radle has been under the care of licensed medical doctors.

81. Mr. Radle has appealed all adverse benefit determinations and exhausted all available administrative remedies.

## COUNT I
## BREACH OF FIDUCIARY DUTY PURSUANT TO 29 U.S.C. § 1132(a)(3)

82. Paragraphs 1-79 are incorporated in Count I by reference as if fully set forth as Paragraph 80.

83. Mr. Radle brings this claim against Unum under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), which permits a participant to bring an action to enjoin any act or practice which violates ERISA or the terms of the plan or to obtain other appropriate equitable relief to redress such violations or to enforce any provisions of ERISA or the terms of the plan.

84. In terminating benefits under the Plan, Unum, acting as a fiduciaries in the administration of Mr. Radle's claim, failed to adequately consider the facts and circumstances regarding his claims, failed to adequately investigate the facts supporting his claim, and relied on biased reviews of Mr. Radle's medical conditions in terminating benefits.

85. ERISA § 503, 29 U.S.C. § 1133 requires that every employee benefit plan must:

   a. provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant; and

   b. afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

86. In Unum's denial letter dated February 5, 2021, it was indicated that Unum had generated additional evidence during the appeals process, which had not been disclosed to Mr. Radle for comment.

87. The Department of Labor's regulations governing ERISA claims state that to determine the benefit coverage under a Plan, under the claim's procedure of a Plan, the Plan Administrator must provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse determination.

88. To do so, the claim's procedure must:

   "[P]rovide the claimant, free of charge, with any new or additional evidence considered, relied upon, or generated by the plan, insurer, or other person making the benefit determination (or at the direction of the plan, insurer or such other person) in connection with the claim; *such evidence must be provided as soon as possible and sufficiently in advance on which the notice of adverse benefit determination on review is required* to be provided . . . to give the

> claimant a reasonable opportunity to respond to that date." (CFR 2560.503-1(h)(4)(i) (emphasis added)).

89. Additionally, before the Plan can issue an adverse determination on review on a disability claim based on a new or additional rationale, the Plan Administrator must:

> "[P]rovide the claimant, free of charge, with the rationale; the rationale must be provided as soon as possible and sufficiently in advance of the date on which the notice of adverse benefit determination on review is required to be provided . . . to give the claimant a reasonable opportunity to respond prior to that date." (CFR 2560.503-1(h)(4)(ii)).

90. Pursuant to the regulations above, a Plan Administrator is prohibited from issuing an adverse benefit determination until the administrator complies with the regulations for comment on additional evidence on appeal.

91. In his appeal, Mr. Radle sent in additional information to aide in the review of his appeal.

92. In response to Mr. Radle's appeal the February 5, 2021, denial letter indicated that Unum had generated additional evidence during the appeals process to aide in making an adverse appeal determination.

93. This additional evidence was not disclosed to Mr. Radle for comment.

94. Unum argues that Mr. Radle's claim predates the updated ERISA regulations that were made effective as of April 2018.

95. Therefore, Unum is under the impression that it is not obligated to provide the additional information generated on appeal prior to reaching a final appeal decision and declined to do so.

96. Any new information relevant to Mr. Radle's 2020 appeal occurred after the effective date change in ERISA regulations.

97. As set forth above, Mr. Radle provided objective medical information regarding his disability, however Unum made its claims decisions without reviewing that information or giving that information the appropriate consideration and weight.

98. Unum arbitrarily terminated Mr. Radle's totally disability benefits, without objective evidence of a change in his condition, in order to apply a 24-month maximum limit applicable to disabilities due to mental illness.

99. Unum interpreted the provisions of the Plan in an arbitrary and inconsistent way.

100. Unum did not provide Mr. Radle with a reasonably clear explanation of what evidence they were requiring him to provide, and what standards and guidelines they were utilizing to determine disability.

101. As a result of Unum's violations of ERISA, Mr. Radle suffered actual harm, as he was denied benefits to which he was entitled under the Plan, the incurred attorneys' fees and costs, and suffered other financial losses.

102. Unum breached their fiduciary duties under ERISA § 404, 29 U.S.C. § 1104, insofar as they failed to discharge their duties handling Mr. Radle's benefits claim in a careful, skillful, and diligent manner.

**WHEREFORE**, Plaintiff Michael Radle respectfully prays for judgment against Unum Insurance Company of America granting equitable relief including payment of the amount of unpaid past and future benefits, interest on past due sums, attorney fees and costs and for any other such relief as the Court deems just and proper under the circumstances.

## COUNT II
## WRONGFUL DENIAL OF BENEFITS PURSURANT TO 29 U.S.C § 1132 (a)(1)(b)

103. Paragraphs 1-102 are incorporated in Count II by reference as if fully set forth as paragraph 103.

104. Mr. Radle also brings this claim against Unum under ERISA 29 U.S.C § 1132 (a)(1)(b), which permits a participant or beneficiary to bring a civil action to recover benefits due to them under the terms of their plan, to enforce their rights under the terms of the plan, or to clarify their rights to future benefits under the terms of the plan.

105. Despite Mr. Radle providing substantial evidence that he has been continuously and totally disabled under the terms of the Plan, Unum has denied and continues to deny Mr. Radle's total disability benefit since May 12, 2020.

106. As a result of Unum's wrongful denial of benefits, Mr. Radle has been damaged in the amount of unpaid benefits.

107. Unum's denial of long-term disability benefits was arbitrary and capricious, a breach of fiduciary duties not based on substantial evidence and was the product of a conflict of interest, and serious procedural irregularities.

108. Unum is required to pay the benefits due under the Plan's terms, together with prejudgment interest attorney's fees and costs.

**WHEREFORE**, Plaintiff Michael Radle respectfully prays that this Court:

1) Grant judgment in his favor and against Defendants on all claims;

2) Order that Defendants pay all benefits due under the Plan from to the date of judgment, including interest thereon;

3) Declare Plaintiff's rights under the terms of the Plan, and clarify his rights to future benefits under the terms of the Plan;

4) Enjoin Defendants to provide a procedure for a full and fair review of adverse determinations under the Plan in accordance with 29 U.S.C. § 1133;

5) Enjoin Defendants to discharge their fiduciary duties in accordance with 29 U.S.C. § 1104;

6) Order restitution or surcharge to disgorge Defendants' unjust enrichment in wrongfully delaying and denying benefits and/or to make Plaintiff whole for losses, and payment of his attorneys' fees caused by Defendants' violation of 29 U.S.C. § 1133 and breach of fiduciary duty;

7) Order that Defendant pay the costs of suit, including Plaintiff's attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g); and

8) Award all such other and further relief as this Court deems just and proper.

**GALLAGHER DAVIS, L.L.P.**

*/s/ Adam J. Olszeski*
Matthew R. Davis
Adam J. Olszeski
Gallagher Davis, LLP
2333 S. Hanley Road
St. Louis, MO 63144
(314) 725-1780
(314) 725-0101 Fax
matt@gallagherdavis.com
adam@gallagherdavis.com