## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL RADLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.: 4:21CV1039 HEA |
| | ) | |
| UNUM LIFE INSURANCE COMPANY | ) | |
| OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION, MEMORANDUM AND ORDER</u>

This matter is before the Court on Plaintiff's Motion for Summary Judgment on Count II of his Complaint and on Defendant Unum's Counterclaim, [Doc. No. 103] and Defendant's Motion for Summary Judgment on Count II of Plaintiff's Complaint, [Doc. No. 106]. The parties oppose the respective motions. For the reasons set forth below, Defendant's Motion is granted and Plaintiff's Motion is denied.

### Facts and Background

Plaintiff brings this action against Defendant Unum Life Insurance Company of America ("Unum") pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq. He alleges that Unum wrongfully denied him total long term disability benefits. The parties filed cross Motions for

Judgment pursuant to Federal Rule of Civil Procedure 56 on the remaining Count

II of Plaintiff's Complaint.[1] Plaintiff seeks the reinstatement of his disability

benefits, and Unum seeks affirmance of its decision to terminate Plaintiff's

benefits.

After carefully considering the entire record and arguments, the credibility

of the evidence, and the applicable law, the Court finds Unum properly terminated

Plaintiff's long-term disability benefits. As a result, the Court grants Defendant's

Motion and denies Plaintiff's Motion.

## Undisputed Material Facts

Plaintiff was formerly employed by United Skin, Specialist, LLC ("United

Skin") as a Regional Practice Manager.  As an employee of United Skin, Plaintiff

was a participant in an employee welfare benefit plan funded through a group

insurance Policy No. 405298 002 ("the Policy") issued by Unum to United Skin.

The Policy provided long-term disability benefits to eligible participants. The

Policy provides the following definition of "disabled":

> You are disabled when Unum determines that:
> – you are limited from performing the material and substantial duties of your
> regular occupation due to your sickness or injury; and
> – you have a 20% or more loss in your indexed monthly earnings due to the
> same sickness or injury.

---

[1] On March 13, 2023, this Court granted Unum's Motion for Partial Summary
Judgment on Count I of Plaintiff's Complaint, finding that Unum was entitled to judgment as
a matter of law on Plaintiff's breach of fiduciary duty claim. [Doc. No. 67.] This ruling on the
instant motion disposes of all of Plaintiff's claims.

After 24 months of payments, you are disabled when Unum determines that due to The same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

You must be under the regular care of a physician in order to be considered disabled. The loss of a professional or occupational license or certification does not, in itself, constitute disability.

The Policy contains the following definitions:

Limited means what you cannot or are unable to do.

Material and Substantial Duties means duties that:

– are normally required for the performance of your regular occupation; and
– cannot be reasonably omitted or modified.

Regular Occupation means the occupation you are routinely performing when your disability begins. Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location.

Sickness means an illness or disease. Disability must begin while you are covered under the plan.

Injury means a bodily injury that is the direct result of an accident and not related to any other cause. Injury which occurs before you are covered under the plan will be treated as a sickness. Disability must begin while you are covered under the plan.

The Policy includes:

WHAT DISABILITIES HAVE A LIMITED PAY PERIOD UNDER YOUR PLAN?

The lifetime cumulative maximum benefit period for all disabilities due to mental illness is 24 months. Only 24 months of benefits will be paid even if the disabilities:

– are not continuous; and/or
– are not related.

The Policy defines "mental illness" as follows:

Mental Illness means a psychiatric or psychological condition classified in the Diagnostic and Statistical Manual of Mental Health Disorders (DSM), published by the American Psychiatric Association, most current as of the start of a disability.

Such disorders include, but are not limited to, psychotic, emotional or behavioral disorders, or disorders relatable to stress. If the DSM is discontinued or replaced, these disorders will be those classified in the diagnostic manual then used by the American Psychiatric Association as of the start of a disability.

On May 4, 2016, Plaintiff, while running, tripped and hit his head on a concrete sidewalk. Plaintiff returned to work the next day. On May 9, 2016, Plaintiff went to St. Luke's Emergency Department where he was diagnosed by Dr. William J. Campbell as having a concussion.

On May 15, 2016, Plaintiff was admitted to Mercy Hospital where he was seen by Dr. William R. Logan. In medical records of Plaintiff's May 15, 2016 hospital visit, Dr. Logan noted that "post-concussive syndrome" was the "most likely diagnosis" for Plaintiff's condition. On May 16, 2016, Plaintiff was discharged from Mercy Hospital with no restrictions or limitations on his ability to work.

In medical records of Plaintiff's May 2016 hospital visit, it was noted that:

Pt was seen by Dr. Logan from neurology who felt that [symptoms] were most c/w post concussive syndrome. MRI brain was done which showed small arachnoid cyst just posterior to left cerebellum and under left occipital pole. Dr. Logan felt that this was congenital, was not the cause of any [symptoms], and did not require further w/u. Pt was educated on post concussion symptoms and the importance of 'brain rest.' He was told to not participate in any high impact physical activities until cleared by his PCP. He needs a graduated physical activity plan taking into account any recurrent [symptoms]. At the time of [discharge], [patient] was feeling fine with exception of occasional HA.

Plaintiff continued to work until August 15, 2017.

On August 15, 2017, Plaintiff was admitted to Mercy Hospital for certain symptoms, including left arm and leg heaviness. At Mercy Hospital, Plaintiff "underwent extensive evaluation, including labs, Brain MRI, C-spine MRI, NCS/EMG study which was all unrevealing." At Mercy Hospital, Plaintiff was diagnosed with conversion disorder by Dr. Ryan Kroeger, a hospitalist, and Dr. Logan, a neurologist. In medical records of Plaintiff's August 2017 visit, Dr. Kroeger noted:

MRI brain 8/16/17 normal. Nerve Conduction study 8/17 normal. MRI cervical spine 8/17 with mild arthritis changes, but otherwise normal; this MRI also included a long view of the whole cord which was normal. Echo 8/17 normal. Carotid US 8/16 normal. Seen by Dr. Logan and then by Dr. Kos from neurology for a second opinion. No neurologic explanation for his symptoms. At this time, I believe his signs and symptoms most consistent with conversion or somatization. We discussed that Cymbalta and cognitive behavioral therapy may help him. He declined these options. He was offered home therapies, but he refused. He was offered neurology follow up, but seemed reluctant. Follow up with Dr. Myles.

On August 19, 2017, Plaintiff was discharged from Mercy Hospital.

On August 21, 2017, Plaintiff was again admitted to St. Luke's Hospital this time for a neurology consultation/evaluation. On August 22, 2017, Dr. Michael Snyder, a neurologist, performed a neurological examination on Plaintiff. In medical records of Dr. Snyder's August 2017 evaluation of Plaintiff, the results of Plaintiff's neurological evaluation are noted:

> Neurologic:
> Alert/oriented, fluent speech. Can give detailed and cogent history CN-XII intact. Motor 5/5 in all extremities: LEs some giveway and non-organic "shaking" of the legs which was variable and distractible (remitted with contralateral activation), but full strength was demonstrated at least briefly throughout. Tone is normal with no clonus. Reflexes are normal with no hyperreflexia or Babinski. Intact sensation to LT/PP/Vib sensation throughout all extremities. No dysmetria or ataxia to FNF. No tremors of the arms/hands when held outstretched. No dysdiadochokinesia. He is able to stand on his own power and Romberg is negative, however, his gait is a hysterical astasia-abasia. He has bizarre "bobbing" or shaking of his legs and variable and slow stride length but maintains his balance.

> Dr. Snyder provided the following assessment of Plaintiff:

> Assessment
> Impression:
> Conversion disorder. He clearly has non-physiologic findings on neurological exam. His gait would be characterized astasia/abasia and appears non-physiologic or hysterical. The patient did not volunteer any particular psychological history or stress to me, but this is usually the case in this type of presentation. I don't think that any further neurological work-up in this case is either indicated or would be helpful. I explained this condition to the patient emphasizing that this is not under his voluntary control and is differentiated from malingering. This should improve/resolve with acceptance of the diagnosis and efforts with PT.

> Psych consult.
> Continue PT.

6

No pharmotherapy from my perspective unless recommended by Psych. No further work-up necessary from my perspective. Specifically, I see no indication for LP for CSF evaluation in this case.

Michael Snyder, MD

In August 2017, Plaintiff submitted a claim to Unum for disability benefits. On his claim form, Plaintiff indicated that his last day of work was August 15, 2017.  Plaintiff noted the following medical conditions on his claim form: "conversion/functional neurologic disorder" and "post-concussive symptoms." In connection with Plaintiff's claim for disability benefits, Dr. Snyder signed an Attending Physician Statement where he noted Plaintiff's diagnosis to be "conversion disorder" with an ICD Code of F44.9.2. On the Attending Physician Statement, the "date of first visit for this current condition(s)" was noted as "mid-August '17."

On the Attending Physician Statement, Dr. Snyder noted that Plaintiff had "normal neuroimaging." "Physical Therapy" was noted as the treatment plan on the Attending Physician Statement.

From November 14, 2017 to February 13, 2018, Unum Life paid Plaintiff $5,000 per month in disability benefits under a reservation of rights.

On March 12, 2018, Unum approved Plaintiff's claim for long term

disability benefits and removed the reservation of rights. In its March 12, 2018

approval letter, Unum Life noted, in part: "We approved your benefits… due to

your medical condition of conversion disorder. Your benefits will continue

as long as you meet the definition of disability in the policy provided by your

employer and are otherwise eligible under the policy terms."

In correspondence dated November 9, 2018, Unum advised Plaintiff:

Your policy has a limitation for mental illness conditions. The medical
information in our file indicates that your disability is subject to this policy
limitation. Based on the information we have on file, you are limited to a
maximum of 24 months of benefits.

Your benefits started on November 14, 2017. You will reach the maximum
duration of benefits on November 13, 2019 provided you continue to meet
the policy definition of disability.

Unum continued to pay benefits beyond November 13, 2019 while Plaintiff

challenged the determination that Plaintiff's disability was the result of mental

illness. Finally, in correspondence dated May 12, 2020, Unum advised Plaintiff:

"We cannot pay you Long Term Disability benefits beyond May 13, 2020. You

have exhausted the 24 months of benefits payable for your mental illness. Your

physical conditions do not result in a loss in your functional capacity that precludes

you from performing your occupational duties." As the basis for Unum Life's

determination, it was noted:

You began receiving Long Term Disability benefits effective November 14,
2017 due to the cognitive symptoms and relating impairment resulting from
conversion disorder. On November 9, 2018, we informed you that this

8

condition was limited to 24 months of benefits. By November 13, 2019, you exhausted benefits the policy will allow for due to your mental illness. We have continued to evaluate the extent to which your other conditions affect your ability to work in your regular occupation.

In order to assess your eligibility for benefits beyond November 13, 2020 we needed to understand both your regular occupational duties as well as your functional capacity to determine if you continued to meet the definition of disability.

A vocational rehabilitation consultation reviewed your file and concluded your occupational duties require sedentary level work that is defined as follows:

Physical Demands:

• Mostly sitting, may involve standing or walking for brief periods of time, lifting, carrying, pushing, pulling up to 10 Lbs. occasionally (up to 1/3 of the time) with changes in position for brief periods of time. Frequent (from 1/3 to 2/3 of the time) near acuity.

Occasional accommodation. Occasional travel.

Mental Demands

• Directing, controlling, or planning activities of others
• Making judgments and decisions
• Dealing with people.

We have reviewed records from Dr. Beau Ances, Dr. Kathryn Mary Marlow, Dr. Michael Snyder, Dr. Catherine Radakovic, Dr. Patrick Openlander, Dr. Joseph Yazdi, and Dr. Mark Scheperle. Your file was also reviewed by a physician board certified in clinical psychology and a physician board certified in family medicine.
…

The reviewing physician did not agree with the conclusions of Dr. Radakovic and Dr. Scheperle and completed a full review of your medical records. The reviewing physician did not find support for restrictions that would prevent you from performing your regular occupational duties as

noted above. In reaching this conclusion, the reviewing physician noted the following:

• Your physical exam findings do not support you are precluded from your occupational duties:

> • Although Dr. Radakovic opines your symptoms are related to a post-traumatic visual syndrome, with convergence insufficiency, and saccadic eye movements, as well as reported visual disturbances in the setting of post-concussion syndrome, subsequent therapeutic findings, are not consistent with the lack of capacity for the demands of your occupation, with your uncorrected visual acuity being 20/20 in each eye for distance and near.

> • In addition, it is noted that your symptoms of full body spasms, weakness, stuttering, and wobbling in a chair are the result of a visual stimuli. However, your records show that these symptoms occur at other times without visual stimuli such as hospitalization and an alarm bell.

> • The December 2019 neuropsychology examination by Dr. Fucetola notes normal visual processing speed and normal visuospatial abilities.

> • The December 21, 2018 examination by Dr. Beau Ances, noted your visual fields were full to confrontation; extraocular movements were conjugate and full, with normal saccades.

> • Medical records from Dr. Michael Snyder and Dr. Kathryn Mary Marlow, have indicated you were unable to work due to your diagnosis of conversion disorder.

> • Your diagnostic testing, including, your CT scan, your 2017 and 2019 MRIs and your EEG were within normal limits.

• Your reported activities are consistent with the capacity to perform your occupational duties:

• You reported to the Social Security Administrative Law Judge that

you are able to perform light chores around the house, you can shop online, pay bills, balance your checkbook, you are running, jogging, hiking, engaging in extreme exercise programs and bowling. You are solving brain teaser puzzles, reading, watching movies and dining out. This is inconsistent with the level of activity you have reported to your physicians and us.

• You were able to continue working after your head injury in 2016 and worked through August 15, 2017. This is not consistent with post-concussive syndrome.

• In August 2019, you were discharged from the hospital after a negative workup of symptoms with diagnosis of gait disturbance due to conversion/somatization disorder.

We also consulted with an Ophthalmologist, who is board certified in Internal Medicine and did not find sufficient support for visual restrictions or limitations. Our physician who specializes in Family Medicine considered this consultation during [his] review, which included the following:

• There is a lack of laboratory or radiologic diagnostic findings that would corroborate the presence of a traumatic brain injury, to substantiate the presence of post-traumatic vision syndrome.

• Dr. Radakovic's assertion that your described symptoms "are the direct result of head trauma" is not based on the diagnostics. You were able to resume work activities after the reported trauma from May 2015 [sic] through August 2017. In addition, the event that caused you to stop working in August 2017, was attributed to conversion disorder.

• There is no corroboration with a medical physician specializing in disorders of the eye and visual system, for example a Neuro-Ophthalmologist, or an Ophthalmologist specializing in eye movement disorders. This would be expected with a clinical scenario involving the presence of delayed, prolonged and at times escalating, visual based symptoms.

Since the reviewing physician disagreed with Dr. Radakovic and Dr. Scheperle, another physician who is board certified in neurology reviewed your file. The second reviewing physician agreed with the first physician,

stating that you would be capable of performing activities within the sedentary demand level. In conclusion, the reviewing physicians have agreed your records support a finding that you can perform full-time activity at a level that is consistent with the demands of your occupational duties when excluding your behavioral health condition of Conversion Disorder. You have exhausted the 24 months of benefits for this condition. We have found your other conditions, would not preclude your ability to return to the demands of your regular occupation. Your claim has been closed.

On September 7, 2017, Plaintiff saw Dr. Todd Silverman, a neurologist,

for a neurological consultation. Silverman's assessment/Diagnosis were as follows:

Assessments

1. Postconcussion syndrome-Fo7.81 (Primary)
2. Intractable migraine without aura and without status migrainosus-G43.019
3. Dizziness=R42

The neurologic examination is normal Neuro imaging has been negative. Symptoms are compatible with post concussion syndrome. Thes include headaches, hypersensitivity to light, sound and motion. Cognitively he appears to be intact, though he says that standing concentration is difficult. Most patients recover from postconcussion syndrome within a few weeks to one month. A small minority have prolonged symptoms up to one year or longer.

We will start amitriptyline 10 mg at bedtime and titrate to 20 mg after one week. I explained my findings and impressions in detail with the patient and his partner. He will call me in 2 weeks and we will continue to treat symptomatically as needed. I am optimistic that a full recovery can be achieved over the next few months. We will have a low threshold for obtaining neuropsychological testing should cognitive symptoms continue.

In medical records of Plaintiff's September 7, 2017 consultation, Dr. Silverman

noted:

Mr. Michael Radle was seen in neurologic consultation at the request of Dr. Bill Campbell. The patient is a 49-year-old man who presents with history of

concussion. Approximately one year ago, he was jogging when he tripped over his shoelaces, fell and hit his head. He is unsure whether or not he lost consciousness. There may have been some mild confusion in the immediate aftermath. He was able to get up on his own power and walk home. There he encountered his partner. There was a significant leading wound above the right eyebrow. The patient refused immediate medical care. He began experiencing headaches. These headaches have persisted since the fall. He has also complained of slowness of cognition. He's had hypersensitivity to light, sound and motion. He has not driven. He did return to work. He returned to exercising. Then on August 15, he had an episode of left face and arm numbness, stumbling, and altered cognition. He was seen in the St. Luke's ER. His evaluation was negative and he was ultimately diagnosed with conversion disorder. He has made a complete recovery from the symptoms, though he continues to experience daily headaches and associated photophobia and motion sensitivity.

Dr. Silverman further noted:

In medical records of a September 8, 2017 physical therapy session, it is

noted:

> [Plaintiff] states he has made great improvements. He no longer has clonus symptoms or trouble walking. He is now mostly concerned about his 'dizzy' symptoms and his loss of balance. Feels like he is spinning from within. Just feels off. Has not driven in a year because he feels drunk and unsafe. Would like to get back to running 3x/week, get rid of his dizziness.

On October 16, 2017, Plaintiff saw Adriane Spruell, a Nurse Practitioner

supervised by Dr. Todd Silverman, for a neurologic follow up. The results of Ms.

Spruell's neurologic examination of Plaintiff are noted in medical records as:

Neurologic Exam:

Fully awake and alert. Speech is fluent with normal naming, repetition, and comprehension.
Cranial nerves II through XII are normal.
Motor strength is 5/5 throughout. Muscle tone is normal. No pronator drift.
Sensation is intact to light touch, pinprick, and proprioception.

Romberg sign is negative.
Finger-nose-finger is accurate bilaterally.
Deep tendon reflexes are bilaterally symmetric.
Gait is steady, with normal base, stride, and arm swing.

Nurse Practitioner Spruell reported the following assessments:

Assessments
1. Postconcussion syndrome-F07.81
2. Migraine without aura and without status migrainosus not traceable-G42.009

The neurologic examination is normal. His symptoms remain compatible with post concussion syndrome. Headaches have improved. He continues to have complaints of fatigue and concentration. We will start him on Ritalin 5 mg daily. He [sic] will also refer him to the concussion clinic at Washington University.

On September 25, 2017, Plaintiff saw Dr. Otha Myles for a follow-up visit. In medical records of Plaintiff's September 25, 2017 visit with Dr. Myles, "conversion disorder – F44.9" was noted under "Assessments." Dr. Myles referred Plaintiff to Dr. Beau Ances, a neurologist at Washington University, for treatment of his conversion disorder.

On November 10, 2017, Plaintiff saw Dr. Beau Ances for a neurological examination. Plaintiff's "Chief Complaint" was noted to be "[t]hinking problems and Dizziness." The results of Dr. Ances's November 10, 2017 neurological examination of Plaintiff were noted as follows:

Physical Exam
Neurological Exam:

14

Mental Status: alert, oriented to time, place. and person; intact general fund of knowledge; normal recent and remote memory; normal attention span and concentration; normal language function. He scored 28/30 on the MoCA at today's visit (11/10/17)

Cranial Nerves: visual fields intact to confrontation, extraocular movements full and conjugate, no pathologic nystagmus; facial sensation full and symmetric to light touch; facial movement full and symmetric; hearing intact to conversation and to rubbed fingers bilaterally; palate and tongue movement full; shoulder shrug full and symmetric; normal tongue protrusion and no fasciculations appreciated.

Motor: normal tone in the upper and lower extremities, no atrophy in the proximal or distal extremities, no pronator drift or orbiting. No fasciculations were seen in his arms.

Cerebellar/Coordination: normal rapid alternating movements bilaterally, no Finger-to-nose dysmetria present or past pointing, heel-to-shin was normal Sensory: intact to light touch, vibration, and proprioception, extinction to double simultaneous stimulation not present.

Reflexes: normal, 2/4 in upper extremities and 1/4 in lower extremities with no clonus present, toes downgoing to plantar stimulation bilaterally. Station/Gait: Normal gait and could easily perform tandem and heel walking; Romberg was not present.

Dr. Ances' "Assessment" of Plaintiff was noted as follows:

Assessment

This 49 year old male presenting with post concussive symptoms and past seizure. He has not been able to return back to his baseline. The etiology of these changes remains unknown.
Plan
Impressions:
Plan
I have discussed with the patient the following plan:

l) Would like to get an EEG to detect seizure activity.

2) Would like to get neuropsych testing to get a baseline of cognition.

3) I recommend getting enough sleep and continue to stay active.

4) If he's going out alone, he needs to alert friends/family that he's leaving and where he's going

5) Could see ENT for dizziness.

6) Follow-up in needed.

l have spent about 40 minutes advising patient and caregivers as well.

I discussed my assessment with the patient, and reviewed the plan of action for further evaluation and treatment of his problems.

Plaintiff saw Dr. Ances for neurological examinations on the following dates: May 4, 2018; July 27, 2018; and December 21, 2018. In medical records of Plaintiff's neurological examinations with Dr. Ances, it is noted that the etiology of Plaintiff's condition was "unknown" and that his neurological examinations were normal.

In a timeline submitted to Unum by Plaintiff, it was noted that Plaintiff, "stopped seeing Dr. Ances because he said he didn't know what to do for [Plaintiff]."

On November 14, 2017, Plaintiff saw Dr. Kathryn Marlow for post-concussion evaluation after being referred by Dr. Silverman. In the medical records of Plaintiff's November 14, 2017 visit with Dr. Marlow, it was noted, in part:

Physical Exam

General: alert, pleasant, well-nourished, well-developed, no acute distress
Psychiatric: normal behavior, not particularly anxious-appearing
HEENT: normocephalic, atraumatic, no facial asymmetry, no fluid discharge from eyes, ears, nose, skull

Respiratory: breathing comfortably on room air, no accessory muscle use
Cardiovascular: no lower extremity edema
Abdomen: soft, non-tender, non-distended
Extremities: no abnormalities in alignment
Skin: no rashes, scars, erythema, or discharge noted on arms or legs
Neurologic:
-Mental status: alert and oriented, conversational. intact speech, language. dress. insight. and judgment
-Cranial nerves: EOMI, no nystagmus, PERRLA, face symmetric, normal facial sensation, normal tongue movements and shoulder shrug
-Strength: 5/5 throughout all UE and LE myotomes, some shaking of right lower extremity noted on manual muscle testing only
-Sensation: intact to light touch in UE and LE dermatomes
-Reflexes: 2 + symmetric throughout, no Hoffmans noted
-Gait: non-antalgic, able to take steps on heels and toes, some impairment with tandem gait.

Assessment

Mr. Michael Radle is a 49 year old man with persistent symptoms of headache, difficulty concentrating, photophobia, and personality change since his jogging accident in 9/2016. He also had an episode of altered mental status with seizure like activity in 8/2017 which was determined to be secondary to conversion disorder. He has started workup with Dr. Ances for these conditions.

Plan
-Spoke with Dr. Ances' office staff regarding plan going forward.
--Plan is for EEG, Neuropsychological testing, and balance therapy.
--Given that Mr. Radle has begun workup and treatment with Dr. Ances, will defer to him regarding any further neurologic workup and neuropsychological evaluation.

Mr. Radle may potentially benefit from additional therapies for recovery (i.e.. PT/OT/SLP Occupational Performance Center) in the future as indicated based on workup.

Dr. Marlow's assessment/plan provides:

Diagnosis
1. Injury of head, sequela
2. Impairment of balance.

Plaintiff saw Dr. Marlow on the following dates: January 30, 2018, March 20, 2018, June 12, 2018, September 25, 2018, and November 7, 2018.

The medical records of Dr. Marlow's examinations of Plaintiff show the results of those examinations as normal. In the medical records of Plaintiff's September 2018 visit with Dr. Marlow, it was noted, under the "Plan,": "Continue psychological treatment with Dr. Openlander—encourage meditation and talk therapy to help address current issues."

On i/December 20, 2017, Plaintiff underwent a neuropsychological evaluation with Dr. Robert Fucetola, a neurologist at Washington University. In the medical records of Plaintiff's December 20, 2017 visit with Dr. Fucetola, it was noted, in part:

Summary of Test Results and Conclusions

The neuropsychological data overall revealed Intermittent mild verbal memory Impairment, evident on a test assessing memory for stories, but not on a test assessing memory for words. Although verbal memory impairment could be considered a correlate of the left temporal slowing read on the

EEG, MRI did not reveal underlying structural damage, and thus the reason for temporal slowing is unclear.

Attention, processing speed, executive abilities, language, motor skills, and visuospatial abilities were intact. This level of functioning is expected for someone with Mr. Radle's estimated level of premorbid function (average). Moreover, persistent personality changes would not be expected after this level of mild concussive brain trauma, suggesting that environmental or psychosocial factors may be contributory. However, Mr. Radle did not endorse issues with mood or worry in self-report questionnaires. Recommendations for symptoms management follow:

Recommendations

1. Given mild verbal memory impairment. it is recommended that Mr. Radle consider outpatient cognitive rehabilitation aimed at improving verbal memory, thereby facilitating his return to work. We can assist with a referral to The Rehabilitation Institute of St Louis if so desire (314-658-3800).

2. Given physical limitations, it is recommended that Mr. Radle receive outpatient physical therapy aimed at increasing his level of physical exertion In the Interest of optimizing well being and encouraging independent living.

3. Finally, psychotherapy (e.g., perhaps CBT for psychosomatic symptoms) is recommended to help Mr. Radle manage physical and mental changes that may arise as he progresses towards health. We can assist with a referral, if so desired.

In September 2018, Plaintiff began treatment with Dr. Radakovic, an ophthalmologist, at Webster Eye Care. On March 25, 2019, an Attending Physician Statement signed by Dr. Radakovic was submitted to Unum noting diagnoses of: "post-concussional syndrome, unspecified subjective visual disturbances, convergence insufficiency, and saccadic eye movements." In the Attending

Physician Statement signed by Dr. Radakovic, it was noted that Plaintiff's "visual symptoms due to his head injury do not allow him to function in his previous work environment."

In correspondence dated July 19, 2019, Dr. Radakovic advised Unum that Plaintiff was unable to work on a full-time basis due to "visual sensitivity to motion and convergence."

In correspondence dated November 22, 2019 and signed by Dr. Radakovic on November 30, 2019, Dr. Radakovic indicated "Yes" in response to the question, "Are you asserting any restrictions/limitations from a physical standpoint?"

In January 2020, Dr. Christine Sullivan, a Medical Consultant for Unum board-certified in Family Medicine, attempted to contact Dr. Radakovic because of discrepancies between Dr. Radakovic's opinion relating to Plaintiff's restrictions and limitations and the opinion of Unum's ophthalmology consultant.

In correspondence dated January 24, 2020 and signed by Dr. Radakovic on January 31, 2020, Dr. Radakovic indicated "Yes" in response to the question, "Upon further consideration of the medical information, is it your opinion the sum of the medical evidence supports Mr. Radle is precluded from full time participation with the occupational demands listed above?"

In correspondence dated February 11, 2019, Dr. Openlander advised Unum that it was Dr. Openlander's opinion that Plaintiff's "difficulties" were not "connected to a psychological condition."

In correspondence dated March 11, 2020 sent from Dr. David Goldsmith, a clinical psychologist and medical consultant for Unum, to Dr. Openlander, Dr. Goldsmith advised that he wanted to "gain a better understanding of [Dr. Openlander's] medical opinion and discuss questions I have regarding my interpretation of the available medical data." The March 11, 2020 correspondence noted:

> CONTEXT: The 62-year-old Regional Practice Administrator has been off work since 8/15/17 with medical and psychiatric conditions.
>
> While medical resources are considering the ongoing severity of your patient's non-psychiatric medical conditions, I am completing an analysis of Mr. Radle's co-existing behavioral health conditions.
> Within that context, I reviewed all documentation that you submitted—including an 11/16/2019 narrative—which offered "an attestations regarding the physical condition of your client and recalled that Mr. Radle was receiving disability payments since medical problems forced his termination from a position managing medical offices. As a licensed psychologist:
>
> > - you rejected the position that Mr. Radle's disabling symptoms resulted from a mental disorder, and
> >
> > - you offered professional opinions about his physical coordination, balance, and strength.
>
> ISSUES: I am seeking clarification of your findings and opinions.
>
> MY IMPRESSIONS:

As a clinical psychologist, you evaluated Mr. Radle's behavioral health issues, concerns, symptoms, and complaints – but you did not evaluate his co-existing non-psychiatric conditions or determine the physical functional impact of his medical injuries and illnesses.

It would be appropriate for you to defer opinions about the ongoing nature, severity, and functional impact of Mr. Radle's non-psychiatric conditions to the specialists, who evaluated your client's medical injuries and illnesses.

In response to Dr. Goldsmith's correspondence, Dr. Openlander certified that it was "not necessary to discuss these issues because [Dr. Openlander has] no substantive disagreements with Dr. Goldsmith's impressions, as noted above."

On March 27, 2019, Plaintiff had an initial visit with Dr. Joseph Yazdi, a neurologist, and the results of Dr. Yazdi's examination was normal. Plaintiff also saw Dr. Yazdi on April 10, 2019 and May 8, 2019, and the results of Dr. Yazdi's examinations in April and May were normal. In medical records of Plaintiff's May 8, 2019 visit with Dr. Yazdi, it was noted: "I have ran [sic] out of the usual options. The only thing left is experimental. I explained to them that concept of exosomes, how they work, and how we would use it. They understand that there are no guarantees. My impression is that success would be some improvement in some of his symptoms. They understand and will think about it. I spent 20 minutes with them of which most of it was face to face consultation." No diagnosis/assessment of conversion disorder is included.

In his April 10, 2019 Note Dr. Yazdi detailed the following Assessment:

Epilepsy (disorder)(G40.909/345.90) Epilepsy, unspecified, not intractable, without status epilepticus modified 27 Mar, 2019

Dizzy spells (finding)(R42/780.4) Dizziness and giddiness modified 27 Mar, 2019

Seizure after head injury (finding)(R1/780,33) Post traumatic seizures modified 27 Mar, 2019

Seizure disorder (R56.9/780.39) Unspecified convulsions modified 27 Mar, 2019

Arthropathy of spinal facet joint (disorder)(M12.88) Other specific arthropathies, not elsewhere classified, other specified site modified 27 Mar 2019

Postconcussion syndrome (disorder)(F07.81/310.2) Postconcussional syndrome modified 27 Mar 2019

Concussion with less than 1 hour loss of consciousness (disorder) (S06.0X9A/850.5) Concussion with loss of consciousness of unspecified duration, initial encounter modified 27 Mar, 2019

In his Mar 27. 2019 Note, Dr. Yazdi detailed the following assessment:

Epilepsy (disorder)(G40.909/345.90) Epilepsy, unspecified, not intractable, without status epilepticus modified 27 Mar, 2019

Dizzy spells (finding)(R42/780.4) Dizziness and giddiness modified 27 Mar, 2019

Seizure after head injury (finding)(R1/780,33) Post traumatic seizures modified 27 Mar, 2019

Seizure disorder (R56.9/780.39) Unspecified convulsions modified 27 Mar, 2019

Arthropathy of spinal facet joint (disorder)(M12.88) Other specific arthropathies, not elsewhere classified, other specified site modified 27 Mar 2019

23

Postconcussion syndrome (disorder)(F07.81/310.2) Postconcussional syndrome modified 27 Mar 2019

Concussion with less than 1 hour loss of consciousness (disorder) (S06.0X9A/850.5) Concussion with loss of consciousness of unspecified duration, initial encounter modified 27 Mar, 2019

In correspondence dated November 22, 2019 and signed by Dr. Yazdi on November 25, 2019, Dr. Yazdi indicated "No" in response to the question, "Are you asserting any restrictions/limitations from a physical standpoint?"

On October 9, 2019, Plaintiff began treating with Dr. Mark Scheperle. In medical records for the October 9, 2019 visit with Dr. Scheperle, it was noted in the Physical Exam portion of the record that the exam was "Neurological" and the findings were "Normal."

On March 27, 2020, Plaintiff again saw Dr. Mark Scheperle. In medical records of the March 27, 2020 visit with Dr. Scheperle, it was noted that Plaintiff's neurological examination on that date was "normal." The physical examination was recorded as follows:

## Physical Exam

| Exam | Findings | Details |
|------|----------|---------|
| Constitutional | * | Overall appearance - age appropriate. |
| Eyes | Normal | Conjunctiva - Right: Normal, Left: Normal. |
| Ears | Normal | Inspection - Right: Normal, Left: Normal. |
| Nose/Mouth/Throat | Normal | External nose - Normal. Lips/teeth/gums - Normal. |
| Neck Exam | Normal | Inspection - Normal. Palpation - Normal. |
| Respiratory | Normal | Auscultation - Normal. Effort - Normal. |
| Cardiovascular | Normal | Regular rate and rhythm. No murmurs, gallops, or rubs. |
| Vascular | Normal | Pulses - Dorsalis pedis: Normal. |
| Abdomen | Normal | Inspection - Normal. Auscultation - Normal. No abdominal tenderness. No hepatic enlargement. |
| Musculoskelotal | Comments | rt leg twitching |
| Musculoskeletal | Normal | Gait - Normal. Cervical spine - Normal Inspection and Normal Range of Motion. Thoracic spine - Normal Inspection and Normal Range of Motion. |
| Extremity | Normal | No edema. |
| Neurological | Normal | Memory - Normal. Sensory - Normal. |
| Psychiatric | Normal | Orientation - Oriented to time, place, person & situation. Appropriate mood and affect. |

## History of Present Illness:

1. HIV follow up

   Medication adherence: 100% of doses have been taken. AIDS defining criteria consists of.
   Comments: Tcell 469 Ratio 0.4   viral load improved to 34.

2. post concussion syndrome

   persistent issues   sturering   social isolation during the SARS 2   has kept patient from actibity and
   rehab        Challenging   noise sensivity and  ights  are very sensitive

3. headache

   Additional information: muschrooms      fresh caps mushrooms · brain function  photophobia.

25

Assessment/Plan

| | Detail Type | Description |
|---|---|---|
| 1. | Assessment | Human immunodeficiency virus [HIV] disease (B20). |
| 2. | Assessment | Post-traumatic headache, unspecified, intractable (G44.301). |
| 3. | Assessment | Photophobia (H53.149). |

In correspondence dated April 1, 2020 and signed by Dr. Scheperle on April 15, 2020, Dr. Scheperle indicated "Yes" to the question, "Are you asserting any restrictions/limitations?" Dr. Scheperle noted the following restrictions and limitations: "delayed post concussion symptom with neurocognitive and motor dysfunction."

In correspondence dated April 22, 2020, Dr. Sullivan sent a letter to Dr. Scheperle advising she wanted to "gain a better understanding" of Dr. Scheperle's medical opinion. In correspondence signed by Dr. Scheperle on April 24, 2020, Dr. Scheperle indicated "No" when asked by Dr. Sullivan: "When limiting consideration to only non-behavioral health conditions, do you agree, the sum of the medical evidence does not support Mr. Radle is precluded from full time participation with the occupational demands listed above?"

On June 14, 2019, Julie Jackson, RN, BSN, a Sr. Clinical Consultant for

Unum,  conducted a medical review of Plaintiff's medical records to determine,

"[b]ased on the available medical information, is the insured precluded from

performing the full time functional demands as outlined by the VRC as sedentary?

If yes, please outline the expected duration." In her June 14, 2019 medical review,

Ms. Jackson noted, in part:

> Dr. Joseph Yazdi, Neurology, noted records dated 3/1/19 to 5/8/19 documenting diagnoses of epilepsy, unspecified, dizzy spells, seizure after head injury, post-concussion syndrome. Noted EEG normal. Could not tolerate the Meclizine. Continues with speech issues, right side jerking motions; needs cane for ambulation. No further usual options left; only experimental. Will consider.
>
> Dr. Beau Ances, MD, Ph.D. Neurology, Psychiatry, noted on 12/21/18 the EE's detailed history and treatment. Opined post-concussion syndrome symptoms and question of past seizure; not able to return to baseline status. Etiology of changes remains unknown. Has had a post-traumatic episode. Needs to be seen by vision therapy. Plan to follow-up in 6 months.
>
> In summary, review of the multiple medical records in the file document the EE has been evaluated and treated by multiple providers without a specific etiology identified for his symptoms. He has been noted to have post-concussion syndrome, conversion disorder, seizure like episodes, vestibular migraines; however, has been treated with multiple medications, therapies, as well as recent recommendations for physical bracing of his RLE. Diagnostic testing with CT, MRI, and EEG have all been primarily normal without specific findings to explain his symptomatology.
>
> However, the EE continues to have significant physical symptoms visual disturbances, leg spasms, hand clenching, stuttering, and balance difficulties, as well as hypersensitivity.
>
> It is currently uncertain if the EE's symptoms are from a behavioral health perspective or have a physical component.

On September 24, 2019, Ms. Jackson conducted a second medical review to determine if Plaintiff had any restrictions and/or limitations following receipt of additional medical records. Ms. Jackson wrote:

> In summary, review of the multiple medical records in the file document the EE has been evaluated and treated by multiple providers without a specific etiology identified for his symptoms. He has been noted to have post-concussion syndrome, conversion disorder, seizure like episodes, vestibular migraines; however, has been treated with multiple medications, therapies, as well as recent recommendations for physical bracing of his RLE. Diagnostic testing with CT, MRI, and EEG have all been primarily normal without specific findings to explain his symptomatology.
>
> However, the EE continues to have significant physical symptoms visual disturbances, leg spasms, hand clenching, stuttering, and balance difficulties, as well as visual hypersensitivity.
>
> It is currently uncertain if the EE's symptoms are from a behavioral health perspective or have a physical component, however all diagnostic testing has been normal and there has been no physical diagnosis provided. There has been no real improvement in the EE's symptoms despite all treatments, therapies, time since his injury, and normal diagnostic findings.

On December 18, 2019, Ms. Jackson completed a third medical review to determine: "Does the available documentation support that EE has a physical condition causing a decrease in functionality preventing the performance of occupational demands identified by VRC? If so, for what duration?" This review included the additional records from Drs. Openlander, Yazdi, and Radakovic. Ms. Jackson concluded, in part:

> In summary, review of the multiple medical records in the file document the EE has been evaluated and treated by multiple providers without a specific etiology identified for his symptoms. He has been noted to have post-

concussion syndrome, conversion disorder, seizure like episodes, vestibular migraines; however, has been treated with multiple medications, therapies, as well as recent recommendations for physical bracing of his RLE. Diagnostic testing with CT, MRI, and EEG have all been primarily normal without specific findings to explain his symptomatology. However, the EE continues to have significant physical symptoms visual disturbances, leg spasms, hand clenching, stuttering, and balance difficulties, as well as visual hypersensitivity.

It is currently uncertain if the EE's symptoms are from a behavioral health perspective or have a physical component, however all diagnostic testing has been primarily normal and there has been no physical diagnosis provided. There has been no real improvement in the EE's symptoms despite all treatments, therapies, time since his injury, and normal diagnostic findings.

Given his ongoing symptomatology, Dr. Openlander and Dr. Radakovic have both opined the EE has R/Ls from a physical perspective, without the capacity to outline or provide a specific diagnosis. These are the only current treatment providers. Neurology is no longer providing any R/Ls for the EE.

On January 18, 2020, Dr. Richard Eisenberg, a board certified

ophthalmologist and medical reviewer for Unum, conducted a medical review to

address the following issue:

Medical Issue to be addressed:

Do the exams and test results (with attention to the notes of neuro-optometrist D. Radakovic) and other relevant information in the file from a neuro-ophthalmologic standpoint, support restrictions and limitations from the demands of the occupation noted below?

In his medical review, Dr. Eisenberg stated, in part:

After a full review of the medical file, I opine that there does not exist sufficient support for visual R and L's. This determination is based on the following considerations:

The uncorrected visual acuity of the insured is 20/20 in each eye at distance and near. This satisfies the visual requirement of the insured's occupation, as determined by VRC.

There is a notable lack of laboratory or radiologic diagnostic findings that would corroborate the presence of traumatic brain injury in the insured, and therefore substantiate the presence of "post traumatic vision syndrome." Both the EEG and MRI exams have been interpreted as being unremarkable. There exists a general large degree of incongruity between the insured's self-described symptoms and behavior with the associated testing parameters, both on physical examination and with ancillary testing.

Dr. Radakovic's assertion that the insured's self-described symptoms and behavior "are a direct result of head trauma" is unfounded. The insured was able to resume work activities after the reported head trauma in May, 2016; moreover, the precipitating event on 8/15/17, over a year after this incident, was thought to be due to a Conversion Disorder, not additional head trauma. That the symptoms worsened after this later date belies the correlation between the reported head injury and the visual conditions diagnosed by Dr. Radakovic.

The insured's self-described symptoms of photosensitivity and convergence-triggered muscle spasms, headaches, stuttering, and excessive blinking all escalated with time, even in the face of multiple vision therapy sessions. This is not consistent with the expected recovery from post-concussion syndrome. Moreover, the lack of significant improvement with Dr. Radakovic's therapeutic intervention does not retrospectively support her clinical assessment.

Dr. Radakovic asserts that the insured's dramatic set of symptoms, e.g. full body muscle spasms, weakness, stuttering, wobbling in the chair, and needing to lie down in the dark, are primarily triggered by visual stimuli. I do not agree with this notion, as there were similar exaggerated symptoms and behavior in many other scenarios, such as the hospitalization in 8/17 and in Dr. Openlander's recounting the episode triggered by an alarm bell.

Examination findings described by multiple other medical providers did not corroborate Dr. Radakovic's clinical assessment. For example, Dr. Fucetola, in his Neuropsychological assessment on 12/20/17, found the insured to have 'normal visual processing speed and normal visuospacial abilities.' Dr.

Ances, in his Neurologic exam on 12/21/18, described extraocular movements to be "conjugate and full," and with "normal saccades." There is also no corroboration offered by an M.D. specializing in disorders of the eye and visual system, i.e. a Neuro-Ophthalmologist or an Ophthalmologist specializing in Strabismus (eye movement) disorders. This would be expected with a clinical scenario involving the presence of delayed, prolonged, and at times, escalating, visual-based symptom

On March 26, 2020, Dr. Christine Sullivan, a medical reviewer for Unum

who is board-certified in Family Medicine, conducted a medical review to address:

Referral Questions and Answers:
Does the sum of the medical evidence support the restrictions and limitations precluding the Insured from full time participation with the occupational demands below?

Physical Demands
Mostly sitting, may involve standing or walking for brief periods of time
Lifting, carrying, pushing, pulling up to 10 Lbs occasialy with changes in position for brief periods of time.
Frequent near acuity, occasional, accommodation
Occasional travel

Mental Demands
Directing, controlling, or planning activities for others
Making judgments and decisions:
Dealing with People

Dr. Sullivan addressed the medical records of Plaintiff's treating physicians

And concluded, in part:

[Restrictions and limitations not supported] when considering conditions not excluded from consideration (ie behavioral health conditions and physical conditions noted in prior clinical review as not available for analysis,) the sum of the medical evidence does not support the Insured as precluded from full time participation with the demands of the occupation.

From a post-concussion standpoint there is no neurologist opining restrictions. The Insured's presentation of initially waxing and waning of symptoms with later progression of symptoms is inconsistent with post-concussion syndrome. Conversion disorder has been opined and the file is not inconsistent with this diagnosis, given the negative diagnostics, progression of symptoms not characteristic of post-concussion syndrome and an alternative non-behavioral health-based diagnosis not established in the medical record.

Though a 2017 EEG was noted to have left temporal findings of unclear etiology no epileptiform activity was noted and a 3-day EEG in 2019 was normal per treating neurology. The Insured is on no medications for seizures and neurology AP's have not opined a seizure disorder.

Optometrist AP restrictions and limitations were considered by this OSP and independently by ophthalmology OSP Dr. Eisenberg, who found the medical information did not support the Insured as precluded from the visual demands of the occupation. It is noted the optometrist AP opines visual symptoms as attributable to the Insured's post-concussion syndrome, however the Insured worked in his occupation for 15 months after the injury, consistent with capacity for the demands of the occupation, including the visual demands, in the presence of symptoms attributed to the injury incurred on 5/3/16. No other source of the Insured's visual symptoms has been postulated by the optometrist AP with the progressive symptoms described inconsistent with post-concussion syndrome/post trauma related visual symptoms As such the sum of the medical information does not support the Insured's reported symptoms, sequalae of remote mild head injury diagnosed as post-concussion
syndrome, or visual complaints/conditions preclude full time participation with the
demands of the occupation when behavioral health and physical conditions identified as contractual excluded are not included in the analysis.

On or about April 30, 2020, Dr. Sullivan completed an addendum to her medical

review after receiving additional information, including from Dr. Scheperle, to

address:

Referral Questions and Answers:

When considering conditions other than behavioral health conditions, HIV, Lipodystrophy due to AIDS antiretroviral therapy, Nephrolithiasis, and abnormal kidney function, does the new information to the file change prior OSP opinion that the sum of the medical evidence does not support the restrictions and limitations precluding the Insured from full time participation with the occupational demands below?

Physical Demands
Mostly sitting, may involve standing or walking for brief periods of time
Lifting, carrying, pushing, pulling up to 10 Lbs occasionally with changes in position for brief periods of time.

Frequent near acuity, occasional accommodation

Occasional travel

Mental Demands

Directing, controlling, or planning activities for others

Making judgments and decisions:

Dealing with People

Dr. Sullivan concluded, in part:

[Restrictions and limitations not supported]. The PCP exams were reassuring with the only finding noted (leg tremor) which would not preclude participation with the demands of the occupation, as well as, a finding not commonly associated with post-concussion syndrome, and as such, a finding more consistent with conversion disorder. The Insured reports running and reading, inconsistent with the severity of symptoms reported. No new treatment was recommended. The summary provided by the Insured noted opinions attributed to Dr. Openlander and Dr. Radakovic without new clinical information from these providers and with these providers [sic] opinions previously considered. As such the new information to the file does not change prior OSP opinion that the sum of the medical evidence does not support the restrictions and limitations.

On March 29, 2020, Dr. Vaughn Cohan, a board-certified neurologist and medical reviewer for Unum, completed a medical review. Dr. Cohan concluded, in part:

> Although the claimant's head injury occurred in May 2016, nevertheless, he was able to continue working thereafter. Evidently, symptoms related to his head injury were not impairing and did not preclude work until he presented with acute onset of left-sided weakness 15 months later in August 2017. The mechanism of injury as it occurred in May 2016 would not be expected to result in a secondary progression of symptoms 15 months later. There is no indication that the claimant suffered a secondary injury during the 15 months after May 2016.

> Although the claimant has carried an alleged diagnosis of post-concussion syndrome, the clinical data submitted by treating medical providers reveals relatively normal physical exam signs except for episodic shaking/twitching of the extremities and episodic stuttering, suspected to represent a conversion or somatization disorder. The "abnormal" findings have been inconsistent and variable. It is noted also that the claimant has been treated for behavioral health issues, and it is not clear to what extent those behavioral health issues may have caused or aggravated the claimant's symptoms post head injury. The objective data has also demonstrated relatively normal bedside mental status exam findings and neuropsychological test results. Although the claimant's optometrist has diagnosed the claimant with "post-trauma vision syndrome" (and has opined that the claimant is unable to work), she acknowledges that this syndrome represents a constellation of symptoms that is often "unheard of and undiagnosed".

> An ophthalmology review was conducted by Richard Eisenberg, MD and he noted that the claimant's reported visual acuity of 20/20 OU for distance and near would satisfy his occupational demands, and he concluded that the optometry data submitted did not support a functional impairment that would preclude the claimant from performing his occupational demands on an ophthalmic basis. He also opined that there was no verifiable information to support that the claimant's ophthalmic signs, symptoms, and behavior were the direct result of the aforementioned head trauma.

The claimant's diagnostic test results, including MRI studies, vascular investigations, electroencephalography, EMG and nerve conduction testing, vestibular and oculomotor testing, and neuropsychological data are not indicative of a functional impairment that would preclude the claimant from performing his occupational demands as listed above. The claimant's neurologists, neurosurgeon, and physiatrist have not imposed specific restrictions/limitations. The claimant has acknowledged that he has the capability to perform normal household chores including loading and unloading the dishwasher, doing laundry, engaging in light cleaning, shopping, paying bills, managing finances, and balancing his checkbook. He acknowledged the capability to perform activities including: running, jogging, hiking, exercising, bowling, solving puzzles, reading, watching movies, and dining out. The claimant did state that noise and strobe lighting resulted in some difficulty driving or riding in a car. These reported activities would not be indicative of functional impairment. No medical reports are submitted after November 2019.

In summary, it is my opinion that the available information does not support restrictions and/or limitations and does not support a functional impairment that would preclude the claimant from performing the above listed occupational demands on a fulltime basis. I am in agreement with the OSP opinions of Drs. Sullivan and Eisenberg.

On or about May 4, 2020, Dr. Cohan prepared an addendum to his medical review based on "additional information" that was "submitted for review and consideration," specifically from Dr. Scheperle. (AR 1980-81.)

Dr. Cohan concluded, in part:

The claimant provides a personal "Brain Injury Timeline Summary" which contains information considered on review of previously submitted medical records. A primary care medical report submitted by Mark Scheperle, MD dated October 9, 2019 indicates that the claimant presented to establish care with a new provider. He offered no specific neurologic or ophthalmic issues, and his examination was normal.

A follow-up visit with Dr. Scheperle on March 27, 2020 indicates that the claimant presented with persistent post-concussion symptoms including

headaches, noise sensitivity, and light sensitivity. Medical and neurologic exam findings, including mental status testing, were within normal limits. The claimant acknowledged a prior history of anxiety and depression. No new medical recommendations were made. No comment is made regarding work functionality, restrictions, and/or limitations. However, Dr. Scheperle submitted a work note dated April 5, 2020 in which he states that the claimant has "restrictions and limitations due to delayed post-concussion syndrome with cognitive and motor dysfunction". Dr. Scheperle provides no narrative history describing the symptomatic timeline, no clinical data to support restrictions and limitations, and he does not specify what restrictions and/or limitations are recommended.

On April 24, 2020 Dr. Scheperle states the claimant is disabled from his job. Dr. Sullivan submitted an OSP medical review addendum dated April 30, 2020, and on review of the additional information submitted, she concluded that the documentation did not support a change in her previously stated opinion.

On November 6, 2020, Plaintiff, by way of his counsel, submitted an appeal of the adverse benefit determination. To support his appeal, Plaintiff submitted additional records, including an "Independent Neuropsychological Evaluation" completed by Dr. Timothy Leonberger dated June 19, 2020, an "Independent Medical Examination" completed by Dr. Joseph Yazdi on September 9, 2020, a Vocational Rehabilitation Evaluation completed by Delores Gonzalez dated October 16, 2020, statements of support from friends and coworkers, and additional medical records.

In his appeal, Plaintiff noted: "This letter and the enclosed documents include evidence that Mr. Radle is not suffering from a conversion disorder, but rather a physical ailment best described as a post-concussive syndrome." Plaintiff stated:

Mr. Radle submits for Unum's review an Independent Medical Examination (IME) performed by Dr. Joseph Yazdi, a board-certified neurosurgeon. After examining Mr. Radle and reviewing the medical records, Dr. Yazdi concluded that Mr. Radle's evaluating doctors should have never found him to be exhibiting any psychiatric problems that could result in a conversion disorder. He believes that the 2016 fall was the prevailing factor causing Mr. Radle's head injury. He is experiencing a post-concussion syndrome and is at MMI, and that based on the totality of the medical records, he is permanently and totally disabled.

Dr. Yazdi specifically highlights an EEG positive for left temporal slowing that would suggest a brain injury and visual testing done by Dr. Catherine Radakovic that supported Mr. Radle being diagnosed with a visual disability. (See Admin. R. at 677, 1232.) The visual disability was most likely was triggered by the 2016 fall. As pointed out by Dr. Timothy Leonberger, diagnostic tests of Mr. Radle's brain show a cyst located near Mr. Radle's cerebellum, which is the part of the brain that is responsible for coordinating voluntary movement, balance, coordination, and posture. (See Admin. R. at 382.) The 2016 fall most likely aggravated this physiological defect and caused damage to Mr. Radle's brain which is now manifesting his debilitating physical symptoms.

Dr. Yazdi's report also notes the multiple discrepancies between Mr. Radle's medical records and Unum's reviewing physicians. The discrepancies primarily concern Mr. Radle's visual acuity being at normal levels, despite Dr, Radakovic diagnosing him with a visual disability. and differing MRIs and EEGs. The discrepancies are explained using plain medical definitions that had originally been misinterpreted by Unum.

Plaintiff further stated:

His negatively progressing symptoms have prompted providers Dr. Catherine Radakovic, Dr. Mark Scheperle, and Dr. Yazdi to re-diagnose his condition from a conversion disorder to a delayed post-concussive syndrome. Dr. Scheperle, Mr. Radle's primary care physician, states that his post-concussive disorder has led to neurocognitive and motor dysfunctions. (See Admin R. at 1911, 1949.) Dr. Yazdi ultimately agrees, even though previously he had denied taking any definitive stance. Upon his IME, though, he states that "[i]t is obvious from my medical records that he is totally and permanently disabled and cannot return to even sedentary level

work." On January 16, 2018, Dr. Radakovic also deemed him unable to return to work even at a sedentary level. However, she claimed that his diagnosis should have been post-trauma vision syndrome, an often unheard of undiagnosed syndrome that she explained in a detailed letter to Unum. (See Admin. R. at 1232.) Separately, his treating physicians have stressed that Mr. Radle is not suffering from a behavioral issue in their professional opinions. Instead, be is suffering from a physiologic one possibly linked to his visual deficits and other motor dysfunctions as a direct result of his head trauma. (AR 2062.)

Plaintiff further stated:

Mr. Radle also submits for Unum reviews an Independent Neuropsychological Evaluation that concludes that Mr. Radle's symptoms were not psychologically based and did not meet the conversion disorder criteria. Testing had revealed an average range of intellectual ability and a high average score on executive and cognitive functioning. His physically testing resulted in the low or the extremely  low range, suggesting to the examiner that Mr. Radle was physically disabled. On June 6th, 11th, and 19th of 2020, Dr. Timothy Leonberger performed an Independent Neuropsychological Evaluation of Mr. Radle. In his evaluation, he ruled out exaggeration and malingering for secondary gain through validity measures. Dr. Leonberger diagnosed unspecified neurocognitive disorder (post-concussive syndrome), unspecified Tic Disorder (focal and motor), and unspecified depressive disorder. He opined that the symptoms produced by Mr. Radle were not psychologically based and did not meet the criteria for a conversion disorder. Testing had revealed an average range of intellectual ability, consistently average verbal and language abilities (aside from his verbal tic), an average visual memory, and a high average score on executive and cognitive functioning.

…

Medical records submitted by Mr. Radle's multiple treating physicians are examined. It is shown through these records how his physicians have stressed that Mr. Radle is not suffering from a behavioral issue in their professional opinions. Instead, he is suffering from a physiologic one possibly linked to his visual deficits and other motor dysfunctions as a direct result of his head trauma. His most current treating physicians include Dr.

Catherine Radakovic, Dr. Mark Scheperle, Dr. Patrick Openlander, and Dr. Yazdi.

The denial letter states that Mr. Radle had exhausted his policy's benefits allowed for a mental condition. Initially, Mr. Radle was diagnosed with a conversion disorder. Conversion disorder has been defined as a mental condition in which a patient shows psychological stress in physical ways. Though today Mr. Radle's physicians and psychiatrists believe this is an improper diagnosis, Unum and its reviewing physicians have opined that Mr. Radle's fall in 2016 has led to a series of 'exaggerated' ailments that by definition are all in his head. They further conclude that these conditions 'should not preclude him from his ability to return to his regular occupation demands.

Plaintiff also stated:

Mr. Radle's ongoing symptoms and the totality of the circumstances would make securing and maintain work in the open labor market difficult, if not impossible. Therefore, it was [the vocational expert's] opinion that Mr. Radle would not be a candidate for vocational rehabilitation, as he is not capable of any competitive work due to the May 2016 incident.

On  about November 23, 2020, Dr. Julie Guay, a board-certified neuropsychologist for Unum Life, conducted a medical review to address:

Referral Questions: From your review of the records provided, the neuropsychologic report, and the raw test data, please respond to the following questions.

1.  What level of cognitive function is demonstrated in the neuropsychological testing? (In your response please address the validity of the testing.)

…

2. What, if any, psychological factors are recognized in the neuropsychological testing? (In your response please comment on whether psychological factors affected the cognitive function demonstrated in the testing.)

Upon review of Dr. Fucetola's test results, Dr. Guay concluded:

The claimant's baseline functioning was estimated to be within the average range. The only scores that fell significantly below baseline were scores for immediate and delayed recall for stories. Because performance validity testing was insufficient, it is not possible determine if the lower scores for story recall were due to inconsistency in effort. However, the lower scores cannot be explained by the claimant's medical history nor by weaknesses in auditory attention or other auditory-verbal memory tasks, as the claimant's scores were intact on these measures. Therefore, it is most likely that the lower scores for story recall reflected variability in effort or other performance-related factors such as fatigue, rather than an actual cognitive weakness.

Dr. Guay further stated:

Testing results were provided in the form of raw scores, standardized scores, percentiles, and qualitative descriptors, such as average, below average, etc. depending on the test. Dr. Fucetola states that he administered the Word Choice Test, a standalone measure of performance validity, but he did not state the results, nor did he provide any opinions on performance validity. Evaluation of performance validity is considered to be  insufficient because Dr. Fucetola did not administer additional standalone and/or embedded measures that would provide information about performance validity over the full course of the evaluation.

On January 18, 2021, Dr. Guay completed a second medical review to

consider the evaluation by Dr. Leonberger submitted by Plaintiff and to address:

Referral Questions: From your review of the records provided, the neuropsychologic report, and the raw test data, please respond to the following questions.

1. What level of cognitive function is demonstrated in [Dr. Leonberger's] Neuropsychological testing? (In your response please address the validity of the testing.)
…

2. What, if any, psychological factors are recognized in the neuropsychological testing? (In your response please comment on

whether psychological factors affected the cognitive function demonstrated in the testing.)

Dr. Guay concluded, in part:

Overall, results from cognitive testing reflect intact performance for higher level cognitive functioning and memory, with selective deficits in psychomotor speed and motor functioning. Despite poor scores on processing speed measures, the claimant demonstrated average to above average scores on timed visual processing tasks from the WAIS-IV. The profile of scores is not consistent with concussive injury, nor are the claimant's stuttering and jerky/tic-like motor behaviors which reportedly become more prominent with performance demands or when he appears to be concentrating. Similarly, the claimant's gait behavior is not consistent with concussive injury.

Performance validity testing met minimal standards as described by the National Academy of Neuropsychology and the American Academy of Clinical Neuropsychology. The claimant performed within normal limits on two standalone performance validity measures, but one was the Rey-15, which provides minimal value due to poor sensitivity. In addition, the claimant was tested on three separate occasions and it was not clear if performance validity measures were administered during each session to help capture variability in effort/engagement which could occur. There was no discussion of embedded performance validity measures and in particular, Finger Tapping scores were stated to be very low, but nothing was stated about whether the raw scores exceeded cut-offs for poor effort.

Performance validity remains of some concern. There is inconsistency between the claimant's current and prior testing results. Compared to the prior evaluation, the claimant's scores reflect improvement in memory functioning and decline in psychomotor speed and fine motor performance. There is nothing in the claimant's medical history nor any known neurological syndrome that would explain improvements in memory with a selective decline in psychomotor and visual scanning speed. There is inconsistency between the claimant's current testing results and his reported symptoms. For example, he reported difficulty with memory, processing, and concentration, but performed well on tasks that rely heavily on those abilities, including verbal reasoning, verbal expression, memory for visual and auditory material, and complex problem solving, including tasks that

were administered under the pressure of time. Finally, there is inconsistency
between the claimant's current testing results and his medical history, as
described above.

On the MMPI-2, Dr. Leonberger opined that results were a valid estimate of
the claimant's current level of personality functioning. The clinical profile
reflected significant depression and somatic concerns, as well as passive and
dependent personality traits. Compared to prior testing from 12/2017, the
claimant's testing scores reflected increased mental health concerns,
including symptoms of depression and a preoccupation with medical status.
In my opinion, psychological concerns are a factor in the claimant's
neuropsychological testing results. In particular, the verbal stuttering and
motor tics seem to become more prominent in demand situations and
therefore, appear to have a psychogenic rather than neurological basis.

On January 6, 2021, Ms. Margaret Maxwell completed a clinical review of
the medical records and noted:

After review of the information on file and in consideration of all conditions
individually and collectively; excluding conditions/symptoms caused by
mental illness, the available medical evidence does not support that the
insured is limited from performing the occupational demands in question
beyond 05/12/2020. This is based on the following:

Given the documentation on file is consistent with a mild head injury, the
symptoms would have been reasonably expected to have subsided within 6
months to a year. The insured's ability to work without accommodation from
the reported date of injury, 05/03/2016, to the DOD of 08/15/2017…is not
consistent with a head injury.

On or about January 26, 2021, Dr. Jacqueline Crawford, a board-certified

neurologist and medical reviewer for Unum, completed a medical review to

address:

Referral Questions and Answers:

Excluding conditions/symptoms caused by mental illness, are the reported

42

existence, severity, duration and frequency of the reported signs and
symptoms consistent with the underlying injuries/illnesses and other
documentation in the file? Please explain.

[Restrictions and limitations are not supported]. The duration and severity of
the reported symptom are inconsistent with the sum of the data: mild nature
of the reported concussion, inconsistencies on examination, absence of
explanatory diagnostic findings, treatment intensity and activity.

Dr. Crawford concluded, in part:

Excluding BH and pre-ex conditions, but considering all other conditions
individually and in aggregate, and certifying physician's opinion, with a
reasonable degree of medical certainty the sum of the data does not support
impairment from the demands listed in Question 2 & 3 beyond 5/12/20.

On February 5, 2021, Unum denied Plaintiff's appeal. In the February

2021 denial, it was noted that: "Our appeal review has determined Mr. Radle was

no longer limited from performing the material and substantial duties of his regular

occupation after excluding disabilities due to mental illness." In its February 2021

denial, Unum addressed the "IME" completed by Dr. Yazdi. Specifically, Unum

noted:

You state an 'IME' (independent medical evaluation) had been completed by
Dr. Joseph Yazdi and concluded Mr. Radle's medical providers should never
have determined he was exhibiting psychiatric symptoms or had conversion
disorder.

While this report is acknowledged, and was fully considered as part of the
appeal review of the claim, it is unclear why the report written by Dr. Yazdi
is referred to as an independent medical evaluation. Medical records on file
show Dr. Yazdi treated Mr. Radle in 2019 and had a doctor patient
relationship. He had seen Mr. Radle on multiple occasions, reviewed the
results of an EEG (electroencephalography) and other records, and made
treatment recommendations.

Additionally, Dr. Yazdi previously confirmed on November 25, 2019 he was not providing restrictions or limitations on Mr. Radle's ability to work from a physical perspective.

Medical records confirming Mr. Radle's treatment with Dr. Yazdi were provided to you for review prior to the date this evaluation (referred to as an IME) was completed by Dr. Yazdi in September 2020. Additionally, you have submitted medical records from Dr. Yazdi from 2019 along with the appeal, confirming his prior treatment. Your letter states this evaluation identified discrepancies between Unum's medical reviews and the medical evidence, specifically referencing a "Function Report" sent to the Social Security Administration outlining the Mr. Radle's ability to jog, participate in sports, and other social activities. You state the report from Dr. Yazdi shows this referenced Mr. Radle's pre-disability abilities/activities. You state Mr. Radle has reported these activities worsen his dizziness, headaches, and fatigue.

The February 2021 denial letter further noted:

You state Dr. Yazdi concluded the conclusions of the neuropsychological testing completed in 2017 was 'subjective.' However, you have submitted additional neuropsychological testing which you state supports Mr. Radle's claim. You also state Dr. Yazdi determined additional testing was necessary but no additional testing has been submitted for consideration.

The February 2021 denial letter further noted that Ms. Gonzales' "vocational

opinion has been fully considered."

The February 2021 denial letter further noted:

Following this appeal vocational review, we referred the file to our consulting neuropsychologist for a review of the neuropsychological testing completed in December 2017 as well as the updated testing completed in June 2020, which was completed at your request (you are listed as the referral source).
Our consulting neuropsychologist notes the 2017 testing shows Mr. Radle scored within the average range on a test for pre-morbid functioning. He demonstrated above average performance in working memory, visual

scanning, set switching speed, delayed recall of designs, and delayed recognition of stories and designs. His list learning and list recall ranged from average to above average and he demonstrated average performance for visual spatial ability, range of factual information, graphomotor speed, pragmatic problem solving and mental flexibility, immediate recall of designs, letter fluency, fine motor dexterity, and language comprehension.

He demonstrated below average performance for word naming and category fluency and low to very low performance for immediate and delayed story recall. However, the lack of appropriate validity measures makes it impossible to determine whether these results were accurate or due to a lack of effort. Regardless, our consulting neuropsychologist concluded these below average test results could not be explained by Mr. Radle's medical history or any weakness in his auditory attention or auditory-verbal memory tasks (his scores were intact in these areas).

These conclusions are consistent with the conclusions of Dr. Fucetola, who on December 20, 2017 concluded 'persistent personality changes would not be expected after this level of mild concussive brain trauma, suggesting that environmental or psychosocial factors may be contributory.'

The additional neuropsychological testing completed in June 2020 was completed over four years following Mr. Radle's reported injury. He reported difficulty with balance, dizziness, left sided weakness, fatigue/lack of energy, poor memory for reading material, poor memory for auditory material, headaches, requiring longer to process conversations, the need to focus for walking short periods (while also reporting he walks for enjoyment), becoming irritated and frustrated, and difficulty with housework. This report described mild stuttering, an unusual gait with long uneven strides, the use of a hiking pole, and muscle ticks.

This report showed Mr. Radle's intellectual functioning ranged from average to above average for verbal comprehension, perceptual reasoning, and working auditory memory. His visual working memory was average and his scores were average to above average in complex problem solving, mental flexibility, and memory. He showed extremely low to borderline scores on measures of psychomotor speed, visual scanning speed, grip strength, fine motor speed, persistence, and dexterity.

Overall, the report reflects intact performance for higher level cognitive functioning and memory with selective deficits in psychomotor speed and motor function. While the report shows Mr. Radle showed poor performance in processing speed measures, he demonstrated average to above average scores on timed visual processing tasks (WAIS-IV). Our consulting neuropsychologist found the profile of scores and Mr. Radle's stuttering, ticks, and jerky motor behaviors (becoming more prominent with performance demands or when concentrating) to be inconsistent with a concussive injury.

There are also inconsistences between the testing completed in December 2017 and this more recent testing. Specifically, the more recent testing reflects improvement in memory functioning while showing a decline in psychomotor speed and fine motor function. Our consulting neuropsychologist identified nothing within Mr. Radle's medical history or a medical process with any known neurological condition which would explain improvements in memory with a selective decline in psychomotor and visual scanning speed.

Additional inconsistencies were found with Mr. Radle's test results and his reported symptoms. For example, while reporting difficulty with deficits with his memory, concentration, and ability to process, Mr. Radle performed well on tasks that rely heavily on these abilities.

This report included a valid estimate of Mr. Radle's current level of personality functioning. His profile specifically reflected significant depression, somatic concerns, and passive and/or dependent personality traits. The June 2020 testing showed increased mental health concerns when compared to the 2017 testing. Our consulting neuropsychologist found these findings significant and supported Mr. Radle's stuttering and motor tics were most likely psychogenic rather than caused by a physical/neurological condition.

The file was also referred to our appeal neurologist for review. This review concluded, after considering all of the medical evidence made available for review, and excluding disabilities due to mental illness, there is no medical evidence to support Mr. Radle remains limited from performing the physical, mental, or cognitive demands of sedentary level work as defined. This includes lifting, carrying, pushing and pulling up to 10 pounds occasionally; mostly sitting with occasional standing and walking for brief periods;

frequent near acuity; occasional visual accommodation; occasional travel; directing, controlling, or planning activities for others; making judgments and decisions; and dealing with people.

Our neurologist notes the available medical information shows Mr. Radle stopped working in August 2017 reporting multiple symptoms including left-sided heaviness and tremors, which resulted in a brief hospitalization and an extensive medical work-up. Mr. Radle reported he had previously been a manager for his employer prior to a buy-out. He received a promotion which included a pay raise but resulted in less sleep. Mr. Radle reported symptoms on August 15, after a 'stressful day at work.'

MRIs completed of Mr. Radle's brain have been normal, as were his EMG/NCS (electromyography/nerve conduction study). Mr. Radle was evaluated by two neurologists and diagnosed with conversion disorder (somatization). This is consistent with the filing of his Long Term Disability claim, which included an Attending Physician Statement completed by his neurologist listing a [sic] Impairing diagnosis of conversion disorder.

Mr. Radle has also reported impairment from post-concussive syndrome associated with a fall in May 2016, over a year prior to the date he stopped working. Shortly following this fall he reported stuttering and headaches. However, his neurological exams and a head CT were normal. When he was seen in the hospital on May 15, 2016 a MRI was completed based on his reported headaches, visual changes, and left-sided weakness. This MRI showed incidental congenital findings, which a neurologist concluded were asymptomatic.

An additional MRI was completed in August 2017 and remained normal without evidence of a physical disorder which may result in any delayed cognitive impairment (hydrocephalus, subdural hematoma, or stroke).

The February 2021 denial letter further noted:

Mr. Radle did not report impairing symptoms immediately following his reported fall and did not seek medical treatment for approximately one week, after reporting the delayed onset of symptoms. He worked a seven day week following his reported fall prior to evaluation and continued to work for over a year prior to reporting disability (albeit with reported

accommodations). This is significant, as our consulting neurologist notes symptoms resulting from a concussion are maximal in the hours and days following an injury and are expected to improve over time (within three months in the grand majority of people).

Mr. Radle's ability to work for over a year prior to reporting disabling symptoms due to a mild concussion is inconsistent with physically based neurocognitive impairment resulting from a concussion or ongoing physical impairment extending beyond May 2020. There is no indication Mr. Radle has experienced any additional concussion, injury, stroke (or other physically based neurological incident) to support alternative physically based cognitive impairment beyond May 2020.

Our appeal neurologist concluded the duration and severity of Mr. Radle's reported symptoms is inconsistent with the mild nature of his reported concussion (occurring over a year prior to his reported date of disability), his inconsistent examinations, and the absence of diagnostic findings to explain his reported symptoms.

While his reported and documented stuttering is acknowledged, there remains no physical condition or diagnostic evidence explaining this symptom. Our neurologist notes stuttering is a common manifestation of behavioral health conditions.

Dr. Leonberger speculated on a posterior fossa arachnoid cyst and its impact on the cerebellum. However, a neurologist and neurosurgeon repeatedly identified this unchanged cyst as something present since his birth. Records dated May 16, 2016 specifically reference this cyst and note 'These are congenital. .. do not cause symptoms and require no further [workup]."

Mr. Radle's reported left-sided weakness, shaking/abnormal motor function, and irregular gait were found to be inconsistent with his initial evaluation. When he was seen at Mercy Hospital on May 15, 2016 his exam was described as "somewhat inconsistent and effort dependent."

Additionally, Mr. Radle has at time[s] been inconsistent in reporting his physical deficits, primarily reporting left-sided symptoms while at other times reporting right-side symptoms. This is inconsistent with a physically based neurological disorder.

Mr. Radle's gait abnormalities have also varied, at times describing a bounce
in his step with poor left-sided coordination and at other times showing a
normal gait. In August 2017 he reported he had resumed running. In 2018
Mr. Radle reported he had stopped using his cane and could easily perform
tandem and heel walking with normal Romberg testing. However, later in
2019 Mr. Radle reported he was cane dependent with a shaky gait. In late
2019 he also began to show flailing in his right leg and foot and reported he
requires assistance to get up from a seated position. His gait was severely
ataxic and he was seen dragging his left foot during exams.

Our appeal neurologist concluded this significantly variable presentation is
inconsistent with a physically based movement disorder but would remain
entirely consistent with a functional behavioral health disorder. Multiple
medical providers have opined Mr. Radle's episodic neurological complaints
are not physically-based and his records show a three day EEG was normal
(also consistent with a psychogenic cause of his reported symptoms).

The available medical records also reference headaches. Mr. Radle has been
provided a migraine preventative medication in the past but reported it was
ineffective. However, he has not required urgent or emergency care for
headache pain it does not appear he has sought out additional headache
treatments or medications.

Mr. Radle has also reported visual deficits and multiple opinions have been
provided by Dr. Radakovic. While these are opinions are acknowledged, our
appeal neurologist notes Mr. Radle did not report visual deficits immediately
following his reported fall and continued to work for over a year. This is
inconsistent with the anticipated process of a concussion where neurological
symptoms are highest immediately following the injury. There remain no
other reported injuries or conditions to explain the delayed onset of
impairing visual deficits.

The optometric medical records submitted from Dr. Radakovic were fully
considered. However, it should be noted many of these tests, including
convergence and visual field testing, are dependent on the patient's effort
and participation. A ophthalmologic evaluation completed by Dr. Berdy in
March 2018 showed Mr. Radle's visual fields were normal with no vision
loss. There is no indication Mr. Radle has required a referral to a neuro-
ophthalmologist, as would be expected in a patient reported persistent and
impairing visual deficits.

While Dr. Radakovic has indicated Mr. Radle remains limited from working due to post-trauma vision syndrome, the delayed onset of symptoms remains inconsistent. Additionally, Mr. Radle's diagnostic testing and neurological examinations have yet to identify a physical cause of his reported concussion related deficits (after over four years of evaluation and treatment).

While the opinion of Dr. Radakovic and Mr. Radle's other medical providers are acknowledged, there [sic] conclusions on impairment due to physical medical conditions remain inconsistent with the available clinical and file evidence.

Our appeal review has concluded, after excluding disabilities due to mental illness, there remains no medical evidence to support Mr. Radle remains limited from performing the material and substantial duties of his regular occupation. Accordingly, he is no longer eligible to receive Long Term Disability benefits and the decision on his claim remains appropriate.

Dr. Snyder's opinion and diagnosis of conversion disorder occurred in August 22, 2017. Dr. Snyder did not provide care beyond August 2017.  Dr. Snyder executed a treating physician form for Mr. Radle's STD benefits.

## Standard of Review

ERISA allows a participant in an ERISA-regulated plan to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

The Court reviews plan determinations *de novo* unless the plan grants discretionary authority to the plan administrator. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); accord *Johnson v. U.S. Bancorp Broad-Based*

*Change In Control Severance Pay Program*, 424 F.3d 734, 738 (8th Cir. 2005). The Policy at issue does not give Unum discretionary authority, therefore, the Court reviews Unum's determination *de novo*. As such, the Court gives no deference to Unum's decision. See *Davidson v. Prudential Ins. Co. of Am.*, 953 F.2d 1093, 1095 (8th Cir. 1992). This applies to both issues of plan interpretation and fact-based determinations. *Riedl v. Gen. Am. Life Ins. Co.*, 248 F.3d 753, 756 (8th Cir. 2001).

Plaintiff bears the burden of proving by a preponderance of the evidence that he is entitled to the reinstatement of long-term disability benefits past May 12, 2020, within the meaning of the Policy. See *Farley v. Benefit Tr. Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir. 1992). The parties dispute whether the mental illness Limitation (the "Limitation") applies and precludes Plaintiff from receiving further benefits under the Plan.

Discussion

Unum determined that Plaintiff's disability was the result of a mental illness and therefore he was no longer eligible for disability coverage based on the policy's limitation of 24 months for mental illnesses. Plaintiff challenges this determination, arguing Unum "excluded" coverage based on an incorrect determination that his disability is the result of a mental illness. Under the terms of the Policy, mental illnesses are not excluded from coverage, rather the benefits

provided are limited to 24 months. "When a requirement is 'a prerequisite for entitlement to a benefit under an ERISA plan, the burden of proof will generally be on the plan participant.' *Mario v. P & C Food Markets, Inc*., 313 F.3d 758, 765 (2d Cir.2002). When a requirement 'is set forth in the 'exclusions' section of the plan, the burden is usually on the plan sponsor, who must prove that the exclusion applies.' *Id*. Thus, when a question arises as to the burden of proof, the Court must determine whether the language at issue is tied to the benefits section of the policy or the exclusions section. *See Farley v. Benefit Trust Life Ins. Co*., 979 F.2d 653, 658 (8th Cir.1992)." *Ringwald v. Prudential Ins. Co. of Am*., 754 F. Supp. 2d 1047, 1056 (E.D. Mo. 2010). Thus, Plaintiff's attempt to shift the burden of proof to Unum because of an exclusion is unfounded. The Court must thus determine whether Plaintiff was disabled because of a mental or physical condition.

When reviewing an ERISA plan administrator's decision *de novo*, the Court begins by examining the language of the plan documents. *Kitterman v. Coventry Health Care of Iowa, Inc*., 632 F.3d 445, 448 (8th Cir. 2011). The Court interprets the terms of the plan documents "by giving the language its common and ordinary meaning as a reasonable person in the position of the plan participant, not the actual participant, would have understood the words to mean" and by reading each provision consistently with the plan as an integrated whole. *Id.* (quoting *Adams v. Cont'l Cas. Co*., 364 F.3d 952, 954 (8th Cir. 2004)).

Unum discontinued Plaintiff's long term disability benefits after it paid benefits for 24 months. This discontinuation was based on its determination that Plaintiff's disability was the result of a mental, rather than physical illness. Despite Plaintiffs' characterization of the policy provision as an exclusion, the policy clearly denotes the limitation for mental illnesses. Under the policy, the "maximum benefit period for all disabilities due to mental illness is 24 months." "Mental illness" is defined in the policy as:

> Mental Illness means a psychiatric or psychological condition classified in the Diagnostic and Statistical Manual of Mental Health Disorders (DSM), published by the American Psychiatric Association, most current as of the start of a disability. Such disorders include, but are not limited to, psychotic, emotional or behavioral disorders, or disorders relatable to stress. If the DSM is discontinued or replaced, these disorders will be those classified in the diagnostic manual then used by the American Psychiatric Association as of the start of a disability.

Under the policy, if Plaintiff suffers from a mental illness, Unum's discontinuation of benefits after 24 months was proper. Accordingly, the Court must determine whether Plaintiff has shown by  a preponderance of the evidence that he suffers from a medical condition.

Plaintiff suffered a head injury on May 4, 2016, while jogging. He returned to work the next day. Several days thereafter, Plaintiff sought medical attention for headaches, visual changes, and weakness on his left side on May 9, 2016.

Plaintiff's claim for disability benefits which was submitted in August 2017, indicated his conditions were "conversion/functional neurologic disorder" and

"post concussive symptoms." Dr. Michael Snyder submitted an Attending Physician Statement on Plaintiff's behalf to Unum. In this statement, Dr. Snyder stated Plaintiff suffered from "conversion disorder."

Plaintiff does not dispute conversion disorder is a mental illness, rather, he argues his debilitating conditions are post-concussion syndrome and post traumatic vision syndrome, not conversion disorder.

Plaintiff's medical record does not support Plaintiff's position. After Plaintiff fell on May 4, 2019, he went to St. Luke's Emergency Department on May 9, 2019 where he was diagnosed as having a concussion. Plaintiff was thereafter admitted into Mercy Hospital on May 15, 2019 where Dr. Logan noted that "post-concussive syndrome" was Plaintiff's most likely diagnosis. Plaintiff returned to work for a year.

In August 2017, Plaintiff was admitted into the hospital because of symptoms of irregular gait. After a four-day hospital visit, Plaintiff was diagnosed with conversion disorder. Dr. Kroger, a hospitalist, noted there was no neurologic explanation for Plaintiff's symptoms. Plaintiff was seen by Dr. Logan and Dr Kos, both neurologists, for second opinions.

Plaintiff was discharged from Mercy Hospital on August 19, 2017 and admitted to St. Luke's Hospital on August 21, 2017. On August 22, 2017, Dr, Snyder diagnosed conversion disorder, noting Plaintiff had clearly non-physiologic

findings on the neurological exam. Neurologist Dr. Silverman conducted a neurological examination on Plaintiff on September 7, 2017. He noted Plaintiff's neuro imaging has been negative.  Plaintiff's primary care physician, Dr. Myles included conversion disorder in his assessment on September 25, 2017.

Plaintiff underwent additional testing in October and November 2017 with a nurse practitioner in Dr. Silverman's office and with Dr. Ances. . The results of this testing were normal. Dr. Ances noted that Plaintiff presented with post concussive symptoms and past seizure, but documented the cause of Plaintiff's symptoms as unknown. Dr. Marlow, a physiatrist who treated Plaintiff from November 2017 through November 2018, noted Plaintiff's neurological examinations as normal.

In his claim for disability benefits, Plaintiff himself asserted that his disability was conversion disorder. The claim was approved. Plaintiff began receiving benefits from November 14, 2014 through November 13, 2019. In November 2018, Plaintiff was notified that the maximum benefit period would be reached and would end on November 13, 2019.

Plaintiff submitted additional medical evidence. Dr. Scheperle diagnosed Plaintiff with delayed post concussion symptom with neurocognitive and motor dysfunction in April 2020. Dr. Yazdi, a neurologist, diagnosed Plaintiff with post concussion syndrome disorder as well as other conditions. Dr. Yazdi treated Plaintiff from March 2019 to April 2019. Dr. Radakovic, an ophthalmologist,

diagnosed Plaintiff with post concussional syndrome, unspecified subjective visual disturbances, convergence insufficiency, and saccadic eye movements.

In its consideration of Plaintiff's claim for benefits, Unum reviewed Plaintiff's medical record noting throughout its determination that Plaintiff's neurological examinations had been normal. The physicians and medical testing did not provide any clear medical causes for Plaintiff's symptoms.

Unum provided a detailed analysis of why it determined Plaintiff's disability is the result of a mental illness and not physical illnesses. Unum's reviewing medical personnel detailed their disagreement and supported their conclusions with the medical records provided.

Unum considered Plaintiff's appeal and reviewed the additional submissions Plaintiff provided. A detailed determination was made by Unum and the reasons for the denial of the appeal set out the basis.

Although Plaintiff argues several of his treating physicians diagnosed post concussion syndrome as the cause of his symptoms, the record reveals that while initially Plaintiff was diagnosed with post concussion syndrome, the subsequent record sets out post concussion syndrome in Plaintiff's history rather than current diagnoses.

**Conclusion**

The duty on Plaintiff to establish by a preponderance of the evidence that Unum's determination of his disability arises from a mental illness was in error has not been met. The medical record before Unum failed to establish Plaintiff's disability was the result of physical illness. The length and amount of benefits Plaintiff received under the policy was proper. Unum, therefore is entitled to judgment as a matter of law on Count II of Plaintiff's Complaint.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Cross Motion for Summary Judgment, [Doc. No. 106] is **granted**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment on Count II of Plaintiff's Complaint and Defendant's Counterclaim, [Doc. No. 103], is **denied**.

Dated this 12th day of November, 2024.


_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE